490 So.2d 897 (1986)
EMPLOYERS MUTUAL CASUALTY COMPANY
v.
Teresa TOMPKINS and William E. Tompkins.
No. 55435.
Supreme Court of Mississippi.
June 4, 1986.
*898 Thomas E. Davidson, Robert T. Gordon, Jr., Heidelberg, Woodliff & Franks, Jackson, for appellant.
James W. Nobles, Jr., C.A. Henley, Jr., Jackson, for appellees.
Before PATTERSON, C.J., and DAN M. LEE and SULLIVAN, JJ.
PATTERSON, Chief Justice, for the Court:
Employers Mutual Casualty Company was sued by Teresa and William Tompkins in the Circuit Court of the First Judicial District of Hinds County on March 29, 1982. They sought to recover $50,000.00 on an uninsured motorist claim under an automobile insurance policy from Employers Mutual. They also pressed a claim for punitive damages based upon an allegation of bad faith refusal by Employers Mutual to pay pursuant to the policy. Trina Smith was also a defendant in the suit from whom actual damages was sought.
Trina Smith having failed to plead or otherwise defend, the case proceeded to trial on default in accord with Rule 55(e), Miss.R.Civ.P., because of Smith's minority. A full evidentiary hearing ensued in which the parties presented their evidence including that of Trina Smith who was called as a witness by Employers Mutual.
At the conclusion of the trial a jury verdict of $50,000.00 actual damages and $400,000.00 punitive damages was returned against Employers Mutual. The verdict also included an award of $500.00 for actual damages against Trina Smith. Employers Mutual has appealed. The judgment against Smith remains unchallenged by her.
Trina Smith was 16 years old and had no drivers license when the accident initiating this suit occurred. She had received no *899 formal drivers education course, having been instructed only by her mother in preparation for driving. Trina was uninsured on August 21, 1981, when she left her home between 10:00 and 10:30 p.m., in her mother's automobile with two minor companions to go to a skating rink. Although the driveway in front of her home was circular in design, Trina backed into McCluer Road to proceed on her way. Prior to entering the road she looked both ways and saw one car with a motorcycle behind it approaching from the east. She stated the vehicles were about 500 feet away when observed and estimated they were traveling about 35 to 40 miles per hour. Believing there was time to back into the road she did so and accelerated forward when her automobile was struck from the rear by Tompkins' motorcycle. In her words, on direct examination as witness for Employers Mutual:
... I had gotten in the car and I got out of the car and got back in and I was looking before I backed out.
Q. Did you stop before you backed out?
A. Yes, sir.
Q. Which way did you look?
A. Both ways.
* * * * * *
Q. When you looked to the east what, if anything, did you see?
A. A car and a motorcycle behind it.
Q. In your best judgment, tell the court and jury how far the car was to the east of you at that time?
A. About five hundred feet.
Q. Would it appear to you as you saw it  how did it appear with reference to its speed to be moving?
A. About thirty-five or forty.
Q. What did you do then?
A. I figured I had enough time and backed out.
* * * * * *
Q. Had the car that you had seen behind you before backing out approached closely to the rear of your car?
A. No, sir.
Q. As you started west?
A. No, sir.
Q. Did you maintain the same speed or what happened with regard to your speed after you headed west?
A. Well, I punched down on it.
* * * * * *
Q. How far had you driven after you started west before anything of an unusual nature happened?
A. About one hundred thirty six feet.
* * * * * *
Q. What happened? What did you notice? What did you see? What did you observe after you had traveled that far?
A. As it happened?
Q. What did you see first?
A. I looked in my rear view mirror and when I was looking the motorcycle was passing the car and I said, "Oh, God, I hope he don't hit me", and that's when he slammed on his brakes.
Q. I didn't understand that. Please speak up louder.
A. I said that I looked in my rearview mirror as he was passing a car to see where the car was because he was behind the car  I looked in the rearview mirror and he was passing the car.
Q. And what happened then?
A. I said, "Oh, God, I hope he don't hit me", and he slammed on his brakes and hit me.
Q. In that brief time did you make any estimate, according to your best judgment, about what the speed of that motorcycle was?
A. No, sir. I just know he was going fast. At the time, I didn't.
At the time of the accident William Tompkins was a construction worker, 32 years of age, married, with four children. On Friday, August 21, 1981, Tompkins had spent much of the afternoon and evening, after leaving work, riding his motorcycle for pleasure in Hinds and Madison Counties. It was dark when he headed home via Terry and McCluer Roads. From the Terry-McCluer *900 intersection he traveled west approximately one and one-quarter miles at about 40 miles per hour. He overtook one car that was traveling in the same direction at about 30 miles per hour. At this point he reached a knoll or hill on McCluer Road. He passed a car going east, looked in his rear view mirror for its tail lights and when he looked forward again, he was about to hit the rear of Trina Smith's automobile. He had not seen any vehicles enter McCluer Road ahead of him although he was aware of numerous driveways intersecting the road in the area. In his words:
... When I met that car, it's just a natural instinct  it's just like when you pass a car in your own car, you'll check your rearview mirror and I checked my rearview mirror to make sure there wasn't nothing there and make sure that car had passed by, and when I looked back up I had about a foot and a half to a yard before I was right on top of that car.
Q. Right on top of it. And then you were literally right on top of it, weren't you?
A. Well, I was right on the side of it. I never went on top of it.
Q. You hit it though, didn't you?
A. We hit each other.
Tompkins' policy with Employers Mutual provided different coverages for which separate premiums were paid. The uninsured motorists protection was for $25,000.00 per accident per vehicle. A Ford Truck and an Oldsmobile automobile were the only vehicles listed as covered under the policy. The motorcycle Tompkins was riding when injured had previously been reported to their insurance agent as transportation to and from work for Tompkins; however, it was not designated as a covered vehicle in the policy.
Tompkins was unconscious for ten days following the collision. On Monday, August 24, 1981, following the wreck on Friday, his wife, Teresa, telephoned the office of Albert Moore, their insurance agent and informed of the accident. The person with whom she spoke referred the claim to Billy Wilson, Employers Mutual's Claim Adjuster.
On September 2, 1981, at Wilson's request, a loss notice was prepared by Jean Oldham, an employee of Albert Moore Insurance Agency which gave the time of the accident on August 21, 1981, at approximately 10:02 p.m. It stated "Mr. Tompkins traveling McCluer Road on motorcycle  other party backed out across two lanes into Mr. Tompkins. Mr. Tompkins injured severely. Other party left scene of accident." This loss notice had notations as follows: under "insured vehicle" a notation of "-0- motorcycle  no insurance"; under "remarks," a notation that "insured wants to know if covered by uninsured motorists." This report was received by Employers Mutual on September 3, 1981.
Claims Adjuster Wilson reviewed the policy and informed the Tompkins they had no coverage resulting from the accident. Wilson was not an attorney and ordinarily was not called upon to interpret coverage questions. In a letter of September 3, 1981, to the Tompkins he stated, "We do not believe the uninsured motorists coverage applies in this case. We refer you to Exclusion 1, page 6 of your policy, which exclued [sic] uninsured motorists coverage while occupying, or when struck by, any motor vehicle owned by you or any family member. In view of this, we must respectfully decline any payment in this case. We trust you understand our position in this matter." He relied upon the following policy exclusion to make this determination:
A. We do not provide uninsured motorists coverage for bodily injury sustained by any person:
1. While occupying, or when being struck by, any motor vehicle owned by you or any family member which is not insured for this coverage under this policy. (Emphasis added.)
Five months later, on January 21, 1982, Wilson received a letter from Tompkins' attorney requesting an investigation be made and settlement tendered for injuries received by Tompkins in the accident. This request included medical and police reports *901 as well as information the driver with whom Tompkins had collided was uninsured. Following receipt of this communication Louis Bills, Employers Mutual's Claims Manager, an attorney, was notified.
An investigation followed in which request was made of Employers Mutual's attorney for the Jackson area of the amount of coverage held by Tompkins under the policy when considered in conjunction with Lowery v. State Farm Mutual Auto. Ins. Co., 285 So.2d 767 (Miss. 1973). Local counsel advised there was coverage equal to the statutorily required minimum limit of $10,000.00 per vehicle or a stacked amount of $20,000.00. This determination relied on the case of Talbot v. State Farm Mutual Automobile Ins. Co., 291 So.2d 699 (Miss. 1974), as well as Lowery, supra. On this advice Employers Mutual offered Tompkins $20,000.00 in early February, 1982, which was declined.
On March 16, 1982, another letter from Tompkins' attorney was sent to Employers Mutual demanding payment of $50,000.00 uninsured motorists coverage within five days or suit for policy limits and punitive damages would follow. There appearing to have been no further communication, suit was filed on March 29, 1982, seeking contractual and punitive damages from Employers Mutual and for actual damages from Trina Smith.
On April 1, 1982, Employers Mutual filed a declaratory judgment action in the United States District Court for legal determination of the limits of uninsured motorists coverage held by Tompkins under the policy. On January 13, 1983, the Federal District Court held there was $50,000.00 coverage under the terms of the policy and Employers Mutual's contention, that coverage was limited to the minimum statutory amount "was without foundation or merit" in view of this Court's holding in Lowery, supra. Employers Mutual then tendered the Tompkins $50,000.00 for their claim which was refused.
Trial began on July 19, 1983 and concluded with a verdict in favor of Tompkins against Employers Mutual for $50,000.00 contractual damages and $400,000.00 punitive damages. There was also a verdict for actual damages of $500.00 against Trina Smith.
An explanation of the verdict need be made for clarification. It reads,
We, the jury, find for the plaintiffs against the defendant, Trina L. Smith, and assess their damage at $500.00.
We, the jury, find for the plaintiff, William E. Tompkins and Teresa Tompkins, and assess their actual damages $50,000.00. (actual)
Punitive damages $400,000.00 (pun.).
In this opinion we refer to the award of $50,000.00 as contractual damages arising from the uninsured motorists provision of the policy of Employers Mutual rather than actual damages as mentioned in the jury verdict.
Employers Mutual moved for a remittitur on both awards of damages against it and Tompkins moved for an additur to the award against Trina Smith, all of which were denied. Motions for a judgment notwithstanding the verdict and for a new trial also having been denied, Employers Mutual has appealed with numerous assignments of error. We will consider the relevant assignments as they ordinarily unfold in a case of this type; the assignments concerning actual damages, those concerning contractual damages, and finally those relating to punitive damages.

I.

ACTUAL DAMAGES  TRINA SMITH
Employers Mutual contends the verdict on contractual damages was excessive. Although Trina Smith did not appeal the $500.00 damages judgment against her it is presently in issue because the contractual damage award is directly related to the sum of the award against Trina Smith and additionally, it is subject to the appellant's motion for a judgment notwithstanding the verdict and a new trial.
The justification for the modest verdict of $500.00 actual damages is revealed by the testimony of Trina Smith and William *902 Tompkins which tellingly portrays the complainant as being contributorily negligent to a great extent. The testimony quoted above reveals the complainant was not looking and consequently did not see the Smith vehicle until he was less than one yard from it a split second before the crash. Although Trina was an unlicensed driver, this had no effect upon the complainant's lack of observation. Notwithstanding that Trina should not have been operating the car as an unlicensed driver and probably used poor judgment in backing across the east bound traffic lane, the uncontradicted evidence remains that she did progress westwardly approximately 136 feet before her automobile was struck from the rear by the complainant's motorcycle. Under this factual situation and the guidance of a contributory negligence instruction, we cannot state the jury's verdict of $500.00 against Trina Smith was erroneous. We are of the opinion the trial court did not err in denying the motion for judgment notwithstanding the verdict and motion for a new trial as to her.

II.

CONTRACTUAL DAMAGE AWARD AGAINST EMPLOYERS MUTUAL
Employers Mutual contends the contractual damage award (the jury verdict denotes this as actual damages) is excessive. As observed the jury returned a verdict for $500.00 in actual damages against Trina Smith. Employers Mutual contends this is the sum Tompkins is "legally entitled to recover" from the uninsured motorist and therefore the verdict of $50,000.00 is excessive as to it. Under the provisions of Miss. Code Ann., § 83-11-101 (Supp. 1985), we find,
(1) No automobile liability insurance policy or contract shall be issued or delivered after January 1, 1967, unless it contains an endorsement or provisions undertaking to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury or death from the owner or operator of an uninsured motor vehicle, within limits which shall be no less than those set forth in the Mississippi Motor Vehicle Safety Responsibility Law ... (Emphasis added.)
Tompkins' uninsured motorists policy states, "We will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle ..." Moreover, by Mississippi Code Annotated, § 83-11-107 (1972), the insurer is subrogated to the rights of the insured against the person causing such injury to the extent that payment has been made. We therefore think it anomalous that an award of $50,000.00 carries with it subrogation rights of only $500.00. From these statutes and the policy provisions, it is our opinion an award of contractual damages in excess of the verdict against the uninsured motorist is both unauthorized and excessive. The language of the policy quoted above being in clear and unambiguous language, no citation of authority is needed that the award of $50,000.00 is excessive by $49,500.00. The verdict of $50,000.00 is therefore reduced to $500.00.

III.

PUNITIVE DAMAGES

A. THE TRIAL COURT ERRED IN OVERRULING DEFENDANTS' MOTIONS FOR DIRECTED VERDICT AND PEREMPTORY INSTRUCTION AND IN SUBMITTING THE ISSUE OF PUNITIVE DAMAGES TO THE JURY.
Initially the appellant calls our attention to the familiar refrain,
The rule in Mississippi is settled that punitive damages are not recoverable for a breach of contract unless such breach is attended by intentional wrong, insult, abuse, or such gross negligence that amounts to an independent tort. New Hampshire Ins. Co. v. Smith, 357 So.2d 119 (Miss. 1978)... .
but,
If the Appellant had a legitimate, allowable or arguable reason not to pay the claim of the Appellee, then punitive damages will not lie. (Cites omitted.)

Aetna Cas. & Sur. Co. v. Steele, 373 So.2d 797, 801 (Miss. 1979).
*903 These premises are then followed by the cautionary language in Consolidated American Life Ins. Co. v. Toche, 410 So.2d 1303, 1304 (Miss. 1982), wherein we stated,
We have attempted to make it clear that since punitive damages are assessed as an example and warning to others, they should be allowed only with caution and within narrow limits. If an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie. Neither will they lie in cases of simple negligence involving miscalculation of premiums or benefits... .

1. BILLY WILSON'S INITIAL DENIAL AMOUNTED TO "SIMPLE NEGLIGENCE" AND IS NOT A PROPER BASIS FOR PUNITIVE DAMAGES.
The cornerstones of the appeal having been placed, the argument follows. The first is that Billy Wilson's initial denial of the claim was "simple negligence" and is not a proper basis for punitive damages. The appellant submits it occurred because their Claim Adjuster, Billy Wilson, did not normally handle coverage questions, was not familiar with the Lowery decision, and the agency wanted an immediate decision at a time when their attorney was out of the office. Following this explanation it is contended Wilson's mistake was at most simple negligence and because it was not intentional, willful, or attended by insult, abuse, or gross negligence it comes within the shadow of our decisions in Consolidated American Life Ins. Co. v. Toche, supra, and Bellefonte Ins. Co. v. Griffin, 358 So.2d 387 (Miss. 1978). However, we think these cases are bottomed on clearly different and distinguishable facts which brings us to a conclusion different from that of the appellant.
In Lowery, supra, we held the provisions of an uninsured motorists policy void which excluded coverage for injuries received by the son of an insured. At the time of the son's injury he was operating a motorcycle owned by him but which was not listed in the uninsured motorist policy held by the father for his family. This Court held the exclusion restricting uninsured motorists coverage to the vehicles enumerated in the policy was against public policy because it violated the manifest intention of the Act. For whatever reason Employers Mutual might have had, it retained and continued to use the condemned exclusion in their policies within this State. The exclusion, by its plain terms would lead any reasonable reader to the belief that injuries resulting from the use of an unlisted vehicle would be excluded from coverage. The exclusion:
We do not provide Uninsured Motorists Coverage for bodily injury sustained by any person:
1. While occupying, or when struck by, any motor vehicle owned by you or any family member which is not insured for this coverage under this policy. This includes a trailer of any type used with that vehicle. (Emphasis added.)
Billy Wilson, an experienced claim adjuster of the defendant company, read the exclusion to mean Tompkins had no coverage because the motorcycle he was riding when injured was not listed in the policy. We think Wilson did not make a simple mistake, or any mistake as a matter of fact, in construing the policy as he did for its terms permitted no other reasonable interpretation. His "conceded simple mistake" was not in misreading the exclusion but in correctly reading a void exclusion contained in his company's policies. The fault at this juncture lies within the company rather than its claims adjuster. We therefore reject the argument that Wilson made a simple mistake and that the issue of punitive damages was erroneously submitted to the jury.

2. EMPLOYERS MUTUAL HAD A SOUND BASIS FOR OFFERING $20,000.00.

(a) EMPLOYERS MUTUAL ACTED IN RELIANCE UPON ADVICE FROM COUNSEL.
In reliance upon the advice of local counsel Tompkins' claim in excess of $20,000.00 *904 was denied. It is contended the soundness of this advice is not the issue, but rather the insurer's reliance upon the legal opinion of an experienced insurance attorney when the offer was made. We are urged to hold the insurer had the right to this defense, and although conceding an erroneous interpretation of the policy, that such mistake did not justify punitive damages. Lincoln National Life Ins. Co. v. Crews, 341 So.2d 1321, 1322 (Miss. 1977), does hold,
The mere fact that Lincoln rejected the claims under the provisions of its policy and defended this suit and lost does not justify the imposition of punitive damages.
Gulf Guaranty Life Ins. Co. v. Kelley, 389 So.2d 920 (Miss. 1980), and Aetna Cas. & Sur. Co. v. Steele, 373 So.2d 797 (Miss. 1979), are cited as supporting authority. From this it is contended the legal opinion constituted a "legitimate" or "arguable" reason for the insurer to limit its offer to $20,000.00 and consequently the trial court erred in submitting the issue of punitive damages to the jury.
This contention overlooks, however, the time interval from the first denial of the claim on September 3, 1981, based upon the exclusion and the offer of $20,000.00 shortly after February 1, 1982. Unquestionably during this interval Employers Mutual was not relying on the advice of counsel but upon the void clause in the policy as stated by Wilson to the Tompkins. It is true that subsequent to the attorney's opinion an offer of $20,000.00 was tendered to Tompkins but this also must be reviewed in context with the policy exclusion in the Lowery decision and other cases mentioned in assignment (b) below.

(b) T.E. DAVIDSON'S OPINION WAS REASONABLE.
It is argued that the uninsured motorists coverage in excess of the minimum "stacked" amount of $20,000.00 required by statute is not subject to the exclusion and arguably is legally correct because it is supported in law, particularly Miss. Code Ann. § 83-11-101, § 83-11-111 (1972), and Talbot v. State Farm Mutual Automobile Ins. Co., 291 So.2d 699, 701 (Miss. 1974), wherein we stated:
There is no requirement that the coverage shall be more than the minimum thus stated. As to any policy which grants the coverage required by the aforesaid Act, any "excess or additional coverage shall not be subject to the provisions of this article." Miss. Code Ann. § 83-11-111 (1972). The coverage Insured contends for in this case is excess or additional to that required by the statute and by the express terms of the statute is not subject to its provisions. It follows that the parties to this suit were free to contract as to uninsured motorist coverage in any respect so long as the required coverage is not cut down by the policy provisions. See Harthcock v. State Farm Mutual Automobile Insurance Co., 248 So.2d 456 (Miss. 1971). If State Farm and Insured could contract free of statutory restraint as to excess coverage, they could also contract to limit the coverage to that required by statute. They did this by the "Limits of Liability" provision. Thus the limitation clause is consistent with the statute.
If our consideration went no further and overlooked the interval from the first denial, September 3, 1981, until the first offer, February 1982, it would appear the insurer had a justifiable reason for denying the claim. In our opinion, however, we should not so narrowly limit our review.
When we broaden our evaluation, the exclusion is again doggedly before us. As we read it we note there is no mention of restricting the exclusion to the minimum sums of the Uninsured Motorists Act. Neither do we find the Tompkins were advised the exclusion was fragmented so that a portion of the uninsured motorists benefits was retained in the policy but that a greater portion was excluded because it exceeded the minimal amount leaving the parties free to contract as to it. Stated differently, the argument overlooks the fact that the minimal amount and the excess amount *905 are considered as one under the exclusion without informing the insured of the legal nuances now signaled from Talbot, supra.
In our opinion the exclusion could only mean there was no coverage arising from any vehicle not listed in the policy. The same argument now urged upon us was rejected in Richards v. Allstate Ins. Co., 693 F.2d 502 (1982), by the United States Court of Appeals for the Fifth Circuit. There the insurer contended a similar exclusion should be retained as applying to the coverage in excess of the mandatorily required minimal amount. After noting the policyholders were not informed of the undisclosed coverage, the court stated:
Allstate contends that retaining Exclusion 2 was justified in spite of Lowery and makes two arguments in support of this claim. Both are wholly without merit. First, Allstate asserts that Exclusion 2 was valid insofar as coverage in excess of that required by law was concerned. But this does not explain the fact that Exclusion 2 eliminated all coverage, not just that above the statutory minimum. In this case, for example, Richards' claim was within the statutory minimum, but it was denied based on the language of Exclusion 2. Second, Allstate contends that Exclusion 2 was in effect erased by provision 5 of the policy which stated: "[S]uch terms of this policy as are in conflict with statutes of the state in which this policy is issued are hereby amended to conform." In Allstate's view, this provision corrected any deficiency in the policy. Therefore, it contends that deletion of Exclusion 2 was not required. This argument strains credibility. If it were accepted, Allstate could include in its policies any sort of invalid exclusion and then rely on change provision 5 when challenged. This would mean that policyholders, not insurance companies, would bear the burden of keeping abreast of changes in the law. Clearly this is not the intent of Mississippi's insurance code.
Exclusion 2 as written and as retained in Allstate's policies from 1973 until well after 1977 was invalid under Lowery. Under the court's instructions the jury necessarily found that Allstate's failure to remove Exclusion 2 from its standard automobile policy until after this suit was filed was grossly negligent. This finding is supported by the proof.
693 F.2d at 505.
The present situation and its exclusion are nearly identical, therefore, we are of the opinion that local counsel's advice was not altogether reasonable because it relied upon Talbot's broad terms while overlooking the great probability the insured would read the exclusion as written oblivious to any legal implications imposed upon it by Talbot. We find this assignment to be without merit. Although the appellant contends that Richards v. Allstate Ins. Co., supra, is not controlling, we find it persuasive to support the result reached by the trial court in this case and therefore adopt it as precedent.

3. EMPLOYERS MUTUAL ACTED IN GOOD FAITH IN FILING A DECLARATORY JUDGMENT AND IN MAKING AN IMMEDIATE OFFER UPON THE COURT'S DECISION.
Employers Mutual next argues good faith in filing an action for a declaratory judgment in Federal Court and in making an immediate offer of $50,000.00 to the Tompkins upon receipt of an unfavorable decision. Although the timing of the declaratory judgment action, one day after the State's suit was filed, invites comment that it was to delay Tompkins' claim, we nevertheless hold the filing of the Federal action was an act in good faith because the doors of that court were open to the appellant for the presentation of its theory of the Uninsured Motorists Act. Although such was not accepted by the Federal Court we cannot state the filing was prompted in gross disregard of the claimants' rights. The jury being correctly instructed on this point we opine no prejudice resulted to the defendant from the suit.

4. PUNITIVE DAMAGES ARE NOT APPROPRIATE IN UNINSURED MOTORIST CLAIMS.
While it is true that several courts have questioned whether an insurer in uninsured *906 motorists claims is ever liable for judgment in excess of policy limits by way of punitive damages or statutory penalties; this jurisdiction, obviously, has not done so. The argument is made however, that several courts have held that bad faith claims should not be permitted as a matter of law in uninsured motorists cases because of the relationship between the insurer and the insured. In Baxter v. Royal Indemnity Co., 285 So.2d 652 (Fla.App. 1973), cert. discharged 317 So.2d 725 (Fla. 1975), the court held that punitive damages were not warranted in an uninsured motorists claim even though the initial refusal of the insurer to settle the claim was motivated by bad faith. The court reasoned as follows:
The legal relationship existing between the insured and his insurer on claims for collision damages or damages caused by uninsured motorists is that of debtor and creditor in which no fiduciary relationship is present. It would be a strange quirk in the law to hold that each time a debtor fails or refuses to pay demands made upon it by a creditor, the debtor would be liable for both compensatory and punitive damages even though his failure or refusal was motivated by spite, malice, or bad faith.
285 So.2d at 657.
Also cited are Midwest Mutual Insurance Co. v. Brasecker, 311 So.2d 817 (Fla.App. 1975), cert. denied, 327 So.2d 31 (Fla. 1976), as well as Fletcher v. Aetna Cas. & Sur. Co., 80 Mich. App. 439, 264 N.W.2d 19 (1978); Short v. Grange Mut. Cas. Co., 307 F. Supp. 768, 772 (S.D.W.V. 1969), and McNutt v. State Farm Mut. Auto. Ins. Co., 369 F. Supp. 381 (W.D.Ky. 1973).
We think these cases have little, if any, application to the familiar rule on punitive damages in this State. We repeat that which is stated in New Hampshire Ins. Co. v. Smith, 357 So.2d 119, 121 (Miss. 1978), "Punitive damages are not recoverable for a breach of contract unless such breach is attended by intentional wrong, insult, abuse, or such gross negligence that amounts to an independent tort." (Cites omitted.)
In our opinion the uninsured motorists provision in question is nothing more than a contract to be enforced in accord with its terms and public policy. If a breach occurs as the result of an intentional wrong, insult, abuse, or such gross negligence that an independent tort arises therefrom, then, in that event and only in that event, punitive damages may be awarded. The contingency being not the right to seek punitive damages but whether there are facts from which a conclusion can be safely reached that they are, in their grossness, the equivalent of an independent tort. We remain convinced the right to seek punitive damages serves a valid and justiciable place in our system of jurisprudence. We therefore think this assignment of error is without merit.

B. THE JURY'S VERDICT AWARDING PUNITIVE DAMAGES WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND RESULTED FROM BIAS, PREJUDICE, AND SYMPATHY.
This argument is presented from the point of view that the factual issues of liability for the motor vehicle accident were contested at trial, with the contest being decided in Tompkins' favor. It is urged, however, the facts attending the processing of Tompkins' claim are not in dispute and demonstrate the appellant acted in good faith and upon the advice of counsel. Consequently, it is contended the jury's punitive damage verdict is contrary to all of the evidence and is the result of the jury's sympathy for Tompkins because of his severe injuries and because Employers Mutual is a large insurance company. We are urged to reverse the verdicts of $50,000.00 contractual damages and $400,000.00 punitive damages because they were returned without regard to liability and resulted from sympathy and bias in an effort to compensate Tompkins for his unfortunate condition.
We reject this argument because it completely overlooks the major issue presented to the jury for its resolution. The issue is *907 whether the appellant's continued use of a void exclusion in its insurance contract in violation of the public policy of this State gives rise to a cause of action for punitive damages. The answer must be ascertained, in our opinion, from facts which first show there were actual damages proximately caused by the negligence of an uninsured motorist; second, a denial of the claim by the insurer; and third, whether the denial was in bad faith because it was based upon an exclusion contrary to public policy.
The major premise being avoided, the argument is in the abstract and is meritless in our opinion.

C. THE AWARD OF PUNITIVE DAMAGES WAS GROSSLY EXCESSIVE.

1. THIS COURT HAS THE POWER AND DUTY TO REDUCE EXCESSIVE PUNITIVE DAMAGES.
We are reminded through this contention the Court has the authority to review the amount of the punitive damage award and the duty to reduce the damages if convinced it is excessive. Consolidated American Life Ins. Co. v. Toche, 410 So.2d 1303 (Miss. 1982); First American National Bank of Iuka v. Mitchell, 359 So.2d 1376 (Miss. 1978); and Snowden v. Osborne, 269 So.2d 858 (Miss. 1972). The difficult question exists in the exercise of this authority. In Snowden v. Osborne, 269 So.2d 858 (Miss. 1972), we addressed the question as follows,
The more difficult problem arises from the amount of the award for punitive damages. Though we have opined the instruction to be proper, we are nevertheless constrained to the opinion that there was insufficient evidence adduced to affirm a punitive award in the sum of $30,000... .
269 So.2d at 861.
Reminded of our authority and responsibility we approach the next assignment.

2. THE AMOUNT OF PUNITIVE DAMAGES WAS EXCESSIVE IN RELATION TO THE APPELLANT'S NET WORTH.
Initially we turn to the posture of this suit inasmuch as it consists of three separable, though related, causes. The first is a tort suit based on negligence; the second, a contractual suit for compensatory damages; and the third, a suit based upon an independent tort arising from the denial of the contractual claim. The damages for the tort, assuming negligence and proximate cause, rest in the loss of property, physical injury, or death as revealed by the evidence. The contractual award, if any, is directly dependent upon the terms of the contract. The third is conditioned upon a sum sufficient as punishment for the wrongdoer, and as a deterrence to others from the commission of similar offenses. The damages originate from different theories of law and necessarily rest upon different principles, the only common nexus being the occurrence bringing them on stage.
Heretofore in appraising punitive damages we have sometimes expressed our reasoning through the use of mathematical formulas, such as contrasting the sum of the actual damages to the punitive damages and, comparing the punitive damage award to the net worth of the defendant. At times we have also indulged verbal equations by referring to "a sum so great that at first blush it shocks the judicial conscience" when compared with other awards in different cases. These formulas are attempts to illustrate the court's thoughts in either accepting or rejecting the sum of the award. They do not, and probably cannot, express an exact rule for the determination.
Although inexact, we think the better formula for review is to give due consideration to the degree and nature of transgression from reasonable and lawful practices and the likely harmful effect upon the individual litigant and the public.
More to the point, however, we are now importuned to hold Employers Mutual's *908 financial statement of 1982 exhibiting net assets of $112,332,110.00 does not conform to award and financial worth as expressed in State Farm Mutual Automobile Ins. Co. v. Roberts, 379 So.2d 321 (Miss. 1980); Aetna Cas. & Sur. Co. v. Steele, 373 So.2d 797 (Miss. 1979); Travelers Indemnity Co. v. Wetherbee, 368 So.2d 829 (Miss. 1979); and Allen v. Ritter, 235 So.2d 253 (Miss. 1970). We are asked to evaluate the present punitive damage award by taking notice of both the size of other punitive damage awards and the relative net worth of the defendants. Employers Mutual argues the award of $400,000.00 is incompatible with our other cases and is obviously the result of bias or prejudice.
We have made such comparison, including in the more recent case of Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254 (Miss. 1985), in which a majority of the court through Justice Sullivan stated in appropriate part,
Bankers Life argues that the amount of damages awarded  $1,600,000  is grossly excessive and should be substantially reduced. The point is brought before us by Bankers Life's assignment that the trial judge erred when he denied Bankers Life's post-trial motion for a remittitur of punitive damages or, alternatively, a new trial on the amount of punitive damages.
This issue must be adjudged under the same process of adjudication as is applicable on any other assignment of error. This involves the familiar three-step process of identifying and articulating the applicable rules of law, resolution of all questions of evidentiary fact, and application of the law to the facts. See Boardman v. United Services Automobile Association, 470 So.2d 1024, 1029 (Miss. 1985).
With regard to punitive damages, our rules are necessarily general. Once it is established that punitive damages in some amount should be allowed, the quantum thereof is determined by reference to certain general factors which include:
(1) Such amount as is necessary for the punishment of the wrongdoing of the defendant and deterring defendant from similar conduct in the future, Standard Life Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1977);
(2) Such amount as is reasonably necessary to make an example of the defendant so that others may be deterred from the commission of similar offenses. Reserve Life Insurance Co. v. McGee, 444 So.2d 803, 808 (Miss. 1983); T.C.L., Inc. v. LaCoste, 431 So.2d 918, 923 (Miss. 1983); Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983); Snowden v. Osborne, 269 So.2d 858, 860 (Miss. 1972); and
(3) The pecuniary ability or financial worth of the defendant, Collins v. Black, 380 So.2d 241, 244 (Miss. 1980); Allen v. Ritter, 235 So.2d 253, 256 (Miss. 1970); Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1978); Jones v. Carter, 192 Miss. 603, 610, 7 So.2d 519 (1942).
Punitive damages are an important component of the remedial side of our law whose purpose is the protection of the customer. On these facts our law would seem to authorize a quantum of punitive damages to be that amount reasonably necessary to punish defendant and to provide a substantial deterrent to it and others similarly situated from the commission of similar offenses, all consistent with the pecuniary aility and financial worth of the defendant. In this context, we note that Bankers Life reported to the Commission of Insurance in its 1980 report total assets in excess of $1,300,000,000, and net assets of approximately $294,000,000.
Our case law is to the effect that the determination of the amount of punitive damages is a matter committed solely to the authority and discretion of the jury. See, e.g., Commodore Corp. v. Bailey, 393 So.2d 467, 471 (Miss. 1981); Collins v. Black, 380 So.2d 241, 244 (Miss. 1980); Sandifer Oil Co. v. Dew, 220 Miss. 609, 71 So.2d 752 (1954); Teche Lines, Inc. v. *909 Pope, 175 Miss. 393, 166 So. 539 (1936). These same cases, frequently in the same sentence as has been used to commit sole discretion to determine the amount of punitive damages to the jury, use language expressing a view to the effect that the jury's verdict may be interfered with if it is found "arbitrary or unreasonable" or "against the overwhelming weight of the evidence." Commodore Corp. v. Bailey, 393 So.2d at 472. Other cases recognize that a jury's finding on amount of punitive damages may be disturbed "for exceptional causes." Collins v. Black, 380 So.2d at 244; Snowden v. Osborne, 269 So.2d 858, 861 (Miss. 1972); Woodall v. Ross, 317 So.2d 892, 896 (Miss. 1975).
483 So.2d at 277-278.
From the record before us we are unable to discern any valid reason why the punitive damage award should be reduced and particularly so when consideration is given to the uncontradicted fact that Employers Mutual persisted over a period of years in the use of an exclusion in direct violation of the public policy of this State. We think their reasons for doing so are feeble. The first is that they purchased the standard automobile policy form prepared by the Insurance Services Office, Atlanta, Georgia, and second, the form was approved by the Mississippi Insurance Commission for use in Mississippi after March 1, 1981. Acknowledging the accuracy of these facts, neither indemnify the insurer from damages because the exclusion remains contrary to the state's public policy as expressed by this Court in Lowery, supra, until the Legislature in its wisdom effects a change.
Here, as in Richards v. Allstate Ins. Co., Tompkins suit has benefitted all of Employers Mutual's policyholders by directly causing deletion of the exclusion from the standard Mississippi policy. Additionally, by considering all aspects of the suit we are not convinced the award was too large as punishment for Employers Mutual's failure to timely pay the just claims of Tompkins. We therefore conclude the award as found by the jury was not excessive.
We have reviewed in detail the entire record and are convinced Employers Mutual was afforded a fair trial in accord with our procedures and law.
The judgment of $500.00 actual damages against Trina Smith is affirmed. The judgment of $50,000.00 contractual damages against Employers Mutual is reduced to $500.00 and judgment entered here for that amount. The judgment of $400,000.00 against Employers Mutual is affirmed.
AFFIRMED AS TO ACTUAL AND PUNITIVE DAMAGES; CONTRACTUAL DAMAGES REDUCED TO $500.00.
WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
HAWKINS, J., dissents.
ANDERSON, J., not participating.
HAWKINS, Justice, dissenting:
I respectfully dissent.
I agree that the exclusionary language in the policy was inappropriate. Richards v. Allstate Ins. Co., 693 F.2d 502 (Miss. 1982); Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254, 270-271 (Miss. 1985).
If there had been a continued refusal to pay beyond the initial denial by a claims adjuster based on this exclusion, I think we would have an entirely different case.
When Tompkins' attorney wrote, however, a legal opinion was immediately sought by Employers Mutual from a self-employed, independent lawyer.[1] He advised Employers Mutual it owed $20,000, which it promptly offered to pay. This was refused.
When suit was filed, Employers Mutual had every right to seek a declaratory judgment in the U.S. District Court. When that court ruled there was $50,000 coverage, Employers Mutual promptly offered to pay *910 Tompkins $50,000 in settlement, which he also refused.
There was no continued, obstreperous denial of this claim under the invalid exclusionary clause as in Bankers Life v. Crenshaw, supra. Some credit for good faith should be given Employers Mutual in its February, 1982, abandonment of this defense, and offer to pay $20,000. At the very most, any contention of bad faith should be limited to Employers Mutual's conduct from September 2, 1981, when it first reviewed the claim, to early February, 1982, when it abandoned its initial defense, a period of less than six months. Compare this with a one-year eight-month delay in Bankers Life v. Crenshaw, and insistence following institution of suit of a patently invalid exclusionary clause as an appropriate defense.
Finally, I can hardly see a punitive damages case when an insured turns down $20,000 and later $50,000 in offer of settlement of a claim which ultimately proves to be worth $500.
As to the amount of the punitive damages verdict, it is grossly excessive in any event, in my view, especially in consideration of the factors I have above enumerated. My views as to this Court's function in reviewing the amount of a punitive damages award are set forth in a dissent in Bankers Life v. Crenshaw, supra. I would apply the same rationale in this case and direct a substantial remittitur. I reject the meager role this Court has assigned itself to play in the majority opinion in Bankers Life v. Crenshaw, and the present majority in the review of the amount of punitive damage awards.
I have stated my views as to the need in this state for punitive damages in rare and exceptional cases. Punitive damages have largely come about in insurance industry cases in this state because of the inferior regulation by our insurance commission of rapacious and deceitful practices by a small minority of the insurance companies doing business in our state. Our insurance industry regulatory laws are singularly incomplete. Furthermore, serious consideration might be given to whether the consuming public has sufficient representation on the commission.
I am confident that virtually all need for punitive damages against insurance companies would quickly dissipate if our state insurance commission were not a toothless tiger or a fox-in-the-chicken-coop situation.
Punitive damages imposed with restraint  used and not abused  will encourage enactment of appropriate statutory sanctions and their execution from our Legislative and Executive branches.
Punitive damages imposed without restraint will not survive, in my view, but rather themselves be eliminated by Legislative action before corrective statutory measures are taken to regulate the insurance companies.
No doubt Mr. Tompkins and his counsel will appreciate this Court's opinion and mandate.
Four or five years from now, however, I wonder if the consuming public and trial bar will consider we did them a favor.
NOTES
[1] Compare this with Bankers Life v. Crenshaw supra, where an in-house counsel and an in-house doctor advised the insurance carrier, and who recommended denial.