**Susan SEAY, Plaintiff,**

v.

**SOUTHERN LIFE AND HEALTH INSURANCE COMPANY, Defendant.**

**Civ. A. No. S85–0037 (NG).**

United States District Court, S.D. Mississippi, S.D.

July 15, 1986.

Tim C. Holleman, Ben F. Galloway, Gulfport, Miss., for plaintiff.

Richard P. Salloum, Gulfport, Miss., for defendant.

## MEMORANDUM OPINION

GEX, District Judge.

The Complaint filed in the above captioned action alleges the Defendant insurer ("Southern Life") has failed to pay benefits to Plaintiff in response to her claim submitted under the accident insurance policy (No. Q–19250) the insured maintained with Defendant. Plaintiff further alleges that Defendant "has completely failed to properly investigate or consider the claim", "has acted in complete bad faith with an obvious intent to avoid a contractural (sic) obligation", and that Defendant has so acted "intentionally and maliciously" with "no justifiable or arguable reasons". Plaintiff's prayer for relief includes, *inter alia,* a demand for "all benefits due the Plaintiff under said policy", damages for "intentional mental distress" (sic) and punitive damages.

Defendant's Amended Answer denies the material allegations advanced in the Complaint although it acknowledged that the subject policy was in full force and effect in June of 1984, the date of the events at issue in this cause. Specifically, Defendant avers that the daily income benefits due under the subject policy have been paid. Defendant has also pled that Plaintiff's claim for accidental death benefits was properly denied in view of medical proof which demonstrated that the cause of the

insured's death was due to natural causes which pre-existed the accident in question.

This cause is presently before the Court on Defendant's "Motion for Partial Summary Judgment As To Punitive and Other Extracontract Damages". For the reasons stated below, the Court is of the Opinion that the Motion should be granted.

## I. STATEMENT OF FACTS

In February of 1984, Samuel R. Seay submitted a completed application[1] and initial premium for insurance to Defendant with his wife, the Plaintiff, listed as beneficiary. Defendant issued an accident policy to Mr. Seay with an effective date of May 1, 1984. The policy provided for: (1) the payment of $20,000 upon receipt of due proof by Southern Life that the insured died of an accidental injury to the extent provided in the policy and (2) an $80 daily income benefit during hospital confinement resulting from accidental injury as provided in the policy. The policy did not cover death or hospital confinement resulting from infirmity, illness or disease of any kind.[2]

On June 11, 1984, the 27–year-old insured broke his left leg when he is said to have fallen from a swimming pool diving board. Mr. Seay was taken forthwith to the Gulfport Memorial Hospital where the admitting physician, Dr. E.N. Throop, performed surgery and set the fracture; the procedure was well tolerated and the insured's immediate postoperative recovery proceeded without complication. In the early morning hours of June 16, 1984, however, Mr. Seay was found to be in cardiac arrest in his hospital bed. Efforts at resuscitation were unsuccessful, and he was pronounced dead shortly thereafter. The report of the autopsy performed that day by

the hospital's pathologist, Dr. John S. Basone, contains the following entry:

### PROVISIONAL ANATOMICAL DIAGNOSIS

I. ACCUTE PULMONARY EMBOLUS, RIGHT PULMONARY ARTERY.

II. RECENT FRACTURE WITH OPEN REDUCTION OF LEFT LOWER TIBIA AND FIBULA BONES.

III. SEVERE BILATERAL PULMONARY EDEMA.

IV. EXTENSIVE RIGHT PLEURAL ADHESIONS.

V. FATTY METAMORPHOSIS OF LIVER.

VI. ACUTE SPLENITIS.

Dr. Basone's findings may thus be characterized as suggesting a causal connection between the accident in which the decedent was involved on June 11, 1984, and his subsequent death five days later. At the request of the decedent's father, John Seay, Harrison County Coroner Steve Delahousey secured the services of Dr. Paul McGarry of the New Orleans Coroner's Office to perform a second autopsy. Dr. McGarry performed an autopsy on the decedent on June 18, 1984, and rendered an autopsy protocol dated June 19, 1984, and his microscopic findings are dated November 27, 1984. Dr. McGarry attributed the cause of death "to be related to extensive liver disease with fatty change and cardiomyopathy of unknown cause resulting in sudden cardiac arrest, probably proceeded by arrhythmia". Dr. McGarry's letter to Mr. Delahousey dated October 26, 1984, discloses his opinion that "factors other than the leg injury, principally advanced liver disease and abnormalities in the heart muscle predating the injury, are accounta-

---

**1.** The insured represented on this application that he was currently "in good health and free from all disease". He also responded "no" to the application's inquiry as to whether he had ever suffered from a variety of enumerated diseases, including alcoholism. In the course of discovery conducted in this case the Defendant learned that approximately two years prior to submitting his application for insurance the in-

sured had been confined for three weeks at a drug and alcohol abuse treatment center and had left the center, against staff advice, prior to the conclusion of treatment he was receiving.

**2.** Pertinent language from the policy is more fully discussed below.

ble for death rather than the injury itself or complications of the injury".[3]

Plaintiff's father notified Defendant's district office in Biloxi, Mississippi, of the decedent's death in the latter part of June, 1984, and Plaintiff was furnished with claim forms for benefits shortly thereafter, i.e., two to three weeks. Although the claimant's statement reflects a notarized signature date of July 26, 1984, the "completed"[4] forms were not forwarded by Plaintiff's counsel to Defendant's district office until August 10, 1984. By letter dated August 20, 1984, one of Defendant's agents, John Hough, advised Plaintiff's counsel that it was necessary to receive additional information "[i]n order to expedite the handling of this claim". Hough referred specifically to the need for a certified death certificate, an autopsy report, and an itemized copy of the deceased's hospital bill. The claims were retained in Defendant's district office pending receipt of such information. By letter[5] dated October 9, 1984, Plaintiff's counsel sent Hough (1) the death certificate which indicated the cause of death was pending while the case was under investigation, (2) the hospital death summary, (3) the operation record, and (4) the preliminary autopsy reports of Dr. Basone and Dr. McGarry. No itemized copy of the hospital bill was sent. Defendant's district office transmitted these documents to the claims department of the home office in Birmingham, Alabama, which received them on October 15, 1984.

By letter dated October 18, 1984, Defendant's home office informed its district office that settlement of the daily income benefits claim would be delayed because of the need for the "[h]ospital statement of charges (itemized or summary billing)"; Plaintiff was sent a copy of this letter. By separate letter of the same date from the home office claims department to Plaintiff,[6] Plaintiff was informed as follows:

This will acknowledge the claim that you recently submitted on the above policy.

It will be necessary for us to obtain additional information on this claim, and we anticipate that there will be a delay in settlement. This additional information may consist of medical records, accident reports or similar records.

Please be assured that every effort will be made to conclude this investigation as soon as possible. Should you have any questions, please feel free to discuss them with your agent or the district office to which your premium payments are made.

By letter dated October 18, 1984, Defendant's home office requested from the hospital its "transcript" compiled on the decedent from the date of his admission to the date of his death. On November 1, 1984, Defendant's home office received from the hospital a discharge summary together with a history and physical on the deceased; no billing record was included.

The next written correspondence between Plaintiff and Defendant concerning Plaintiff's claims was from Plaintiff's counsel by letter dated January 10, 1985, to Defendant's district office in which he inquired about the status of the death claim but made no mention of the daily income claim. Also on that date Defendant's home office received from its Biloxi, Mississippi, office a memo to the effect that Plaintiff had called two days earlier to inquire about the status of her two claims. A memo dated January 10, 1984, from Betty Ragland, Senior Claims Manager for the De-

---

**3.** The substance of Dr. McGarry's opinion was later corroborated by Defendant's medical consultant, Dr. Rhodes Johnston, a practicing internist in Birmingham, Alabama, Dr. Leroy Riddick, forensic pathologist and coroner of Mobile County, Alabama, and the investigative report made by Equifax Services at Defendant's instance.

**4.** The physician and hospital charges sections of the daily income benefits claims form submitted by Plaintiff were not filled in.

**5.** The letter states, "[h]opefully, this information will be sufficient to allow you to process the death claim of Susan Seay for the death of her husband ...".

**6.** The district office was sent a copy of this letter. A similar letter dated October 19, 1984, concerning Plaintiff's accidental death claim was sent to Plaintiff from the home office with a copy to the district office.

fendant, to Arvis "Rusty" Akin, second vice-president and Claims Manager for the Defendant, asks, "[s]hould we go ahead and pay the hospital claim? ...". Akin's memo the next day in reply states "O.K. to pay the H/C (hospital claim). He was treated for injury, but died of natural causes". By memo dated January 17, 1985, from Defendant's home office to its Biloxi office the latter was advised that the policy "shows up on the (computer) terminal as an (sic) tape lapse (a storage function). It will be two weeks before it is written up on the terminal. You should receive check in two weeks." The daily income benefits check for $400.00 payable to Plaintiff, representing full payment of the daily income claim, was mailed from Defendant's home office to its district office on January 23, 1985. The district office received the check on January 25, 1985, and on January 28, 1985, mailed it to Plaintiff at her home in Indiana.[7]

With respect to the accidental death claim, Defendant advised Plaintiff's counsel by letter dated January 14, 1985, that as a result of its investigation, and specifically the findings of Dr. McGarry, it was of the opinion that the deceased died from natural causes rather than accidental bodily injury as required by the policy. Accordingly, Plaintiff's counsel was advised that unless he wanted to submit additional documentation, "we must close this file out as a natural death."

This lawsuit was filed on January 21, 1985. The return of an executed summons as to the Defendant reflects a filing date of January 29, 1985.

## II. LAW AND ANALYSIS

The criteria to be employed by this Court in considering the merits of a motion for summary judgment are well established. A grant of summary judgment is appropriate only when it appears from the pleadings, depositions, admissions, answers to interrogatories and affidavits that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c),

Federal Rules of Civil Procedure; *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir.1985); *Rayborn v. Mississippi State Board of Dental Examiners*, 776 F.2d 530 (5th Cir.1985). The purpose of the motion for summary judgment is to test the intrinsic merits of the case and to determine prior to trial whether any factual controversy is presented. *Gossett v. DU–RA–KEL Corporation*, 569 F.2d 869 (5th Cir.1978). Summary judgment is permitted only when "the underlying facts are undisputed, and the record reveals no evidence from which reasonable persons might draw conflicting inferences about these facts". *Prinzi v. Keydril Company*, 738 F.2d 707 (5th Cir.1984). The Court is equally mindful, however, of the task incumbent upon a party opposing a motion for summary judgment. *See Fontenot, Etc. v. Upjohn Co.*, 780 F.2d 1190 (5th Cir.1986); *Thomas v. Harris County, Et Al.*, 784 F.2d 648 (5th Cir.1986); *Bynum v. FMC Corp.*, 770 F.2d 556, 576 (5th Cir. 1985).

For the purposes of the motion presently before the Court, the Court must (1) apply Mississippi law governing the recovery of punitive and other extracontractual damages in insurance contract cases to the above-stated facts and (2) determine whether there exists a genuine issue of material fact which would operate to preclude the movant from obtaining judgment on these claims as a matter of law.

The basic standard controlling a Plaintiff's entitlement to punitive damages against an insurer was articulated in *Standard Life Ins. Co. of Indiana v. Veal*, 354 So.2d 239 (Miss.1978), where the Mississippi Supreme Court quoted with approval language from a previous case that "punitive damages are not recoverable for breach of contract unless such breach is attended by some intentional wrong, insult, abuse, or gross negligence which amounts to an independent tort". 354 So.2d at 247. *Veal* further provides that "if an insurance company has a legitimate reason or an arguable reason for failing to pay a claim,

---

**7.** Plaintiff has not negotiated this check.

punitive damages will not lie ...". 354 So.2d at 248. In Mississippi, punitive damages are not favored and should be allowed only with caution and within narrow limits. *Consolidated American Life Insurance Co. v. Toche,* 410 So.2d 1303, 1304–05 (Miss.1982). In *State Farm Fire to Casualty Co. v. Simpson,* 477 So.2d 242 (Miss. 1985), the Court reaffirmed the above-quoted principles contained in *Veal* but added:

> It does not necessarily follow, however, that punitive damages are mandated by the absence of an "arguable reason." This is so because the denial of a claim could be the result of an honest mistake or oversight—ordinary or simple negligence—not reaching the heightened status of an "independent tort" as set out in *Veal, supra,* and other cases.

## THE ISSUE OF PUNITIVE DAMAGES

We are of the opinion the term "legitimate or arguable reason," although spawning much comment in our cases and in briefs and arguments of counsel, is nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to the heightened level of an independent tort. Additionally, the very term expresses the holding of this Court establishing a distinction between ordinary torts, the product of forgetfulness, oversight, or the like; and heightened torts, which are the product of gross, callous, or wanton conduct, or, if intentional, are accompanied by fraud or deceit. (citation omitted)

This is only to say that not all denied claims constitute the gross, wanton or intentional conduct essential to the creation of an independent tort for which punitive damages will lie.

To the same effect is this language from *Weems v. American Security Ins. Co.,* 486 So.2d 1222 (Miss.1986):

> ... [A]n insurer may have no arguable reason for refusal to pay a claim but may nevertheless not be lawfully subject to an assessment of punitive damages. Where the failure to pay the claim is the

result of "a clerical error or honest mistake", (citations omitted), punitive damages do not lie though objectively speaking the insurer has no arguable reason for failure to honor a just claim. A failure to pay may result from negligence on the part of the insurer and punitive damages are not assessable, again assuming arguendo the objective absence of an arguable reason for such failure to pay. (citations omitted)

Two other recent decisions from the Mississippi Supreme Court contain language consistent with the criteria for the recovery of punitive damages set out in *Veal* and *Simpson.* In *Aetna Casualty & Surety Co. v. Day,* 487 So.2d 830 (Miss.1986), the court stated:

> To recover punitive damages from an insurer for amounts over and above policy benefits an insured must prove by a preponderance of the evidence either (1) that the insurer acted with malice or (2) that the insurer acted with gross negligence or reckless disregard for the rights of others.

In *Employers Mutual Casualty Company v. Tompkins,* 490 So.2d 897 (Miss.1986), the Court states:

> In our opinion the uninsured motorists provision in question is nothing more than a contract to be enforced in accord with its terms and public policy. If a breach occurs as the result of an intentional wrong, insult, abuse, or such gross negligence that an independent tort arises therefrom, then, in that event and only in that event, punitive damages may be awarded. The contingency being not the right to seek punitive damages but whether there are facts from which a conclusion can be safely reached that they are, in their grossness, the equivalent of an independent tort.

Plaintiff's response to Defendant's motion in the instant case abandons any claim she once held for punitive and other extra-contractual damages with respect to her accidental death claim.[8] The remaining

---

**8.** Given the medical opinions contrary to Dr. Basone as to the decedent's cause of death,

Defendant clearly had a legitimate and arguable reason to support its denial of benefits on this

topic for discussion, therefore, is the rationale for the Court's granting of Defendant's motion as to Plaintiff's daily income claim.

The requirements which must be satisfied before the insured or beneficiary is entitled to receive the daily income benefits are stated in the terms of the policy:

4. DAILY INCOME—The Company will pay to the Insured, *upon receipt of due proof* of hospital confinement, as defined below, the Daily Income Benefit....

5. MEANING OF HOSPITAL CONFINEMENT—The Insured must be continuously confined within a legally constituted hospital upon the advice and recommendation of a licensed, practicing physician, *and payment of the charges for such confinement must be legally required.* The confinement ... must result from accidental bodily injury sustained during the continuance of this policy. (emphasis added)

The duty of furnishing written proof of loss to the insurer is also affirmatively placed on the insured through Mississippi statutory and case law. Miss.Code Ann. Section 83–9–5(g)(1972); *Provident Life & Accident Insurance Co. v. Cumbest,* 325 So.2d 569 (Miss.1976). Defendant's proffered explanation for requiring the insured to provide proof that he incurred charges "legally required" for his hospital confinement is that it is designed to prevent a policyholder from receiving the daily income in a scenario where payment of the bill by the insured was not required (i.e., confinement at a charitable institution).

■ The undisputed fact with regard to this claim is that Defendant ultimately tendered payment of the daily income benefits due without ever receiving proof from the Plaintiff that the decedent's hospital charges were legally required, as provided by the policy. The Court is not persuaded by Plaintiff's argument that Defendant waived[9] this requirement by virtue of its

correspondence with Plaintiff dated October 18, 1984. The two letters bearing this date, referenced above, may have been misinterpreted by Plaintiff as shifting the responsibility to the Defendant as to whom should secure the outstanding claim documentation, including the hospital bill. (Akin's deposition, p. 42). Even assuming arguendo, however, that such did constitute a waiver of this particular requirement, this still would not affect the Court's final determination that the Defendant was not guilty of "bad faith" under Mississippi law in its handling of this claim. It is evident that Defendant requested of the hospital by letter dated October 18, 1984, its "transcript" assembled relative to the decedent's period of confinement there, and that "usually, they'll (the hospital) have the hospital statement of charges with it (the patient's medical records)". (Betty Ragland's deposition, p. 43). As pointed out above, the documents sent by the hospital and received by the Defendant on November 1, 1984, did not include the billing record. The fact that Defendant's file on the daily income claim reflects no further activity[10] until January 8, 1985, (the notation of Plaintiff's telephone inquiry)—either evidence of an undertaking by the Defendant to procure a copy of the charges or an additional reminder to Plaintiff to accomplish same—simply does not demonstrate the requisite degree of culpable conduct to warrant a denial of Defendant's Motion. The decision to pay the daily income claim was made on January 11, 1985, ten days prior to the institution of this suit and in prompt response to Plaintiff's inquiry. The Court is of the opinion that the most that can be said of Defendant's handling of this claim—again assuming arguendo waiver by the Defendant—is that it was guilty of simple negligence in not transmitting full payment earlier (i.e., November or December). The Court having

---

claim. *See Peele v. American Fidelity Assur. Co.,* 680 F.2d 374 (1982); *Horton v. Hartford Life Ins. Co.,* 570 F.Supp. 1120 (N.D.Miss.1983).

**9.** The Court is fully cognizant of the liberality employed in favor of the waiver of conditions in an insurance policy inserted for the insurer's

benefit. *Highlands Ins. Co. v. Allstate Ins. Co.,* 688 F.2d 398 (5th Cir.1982).

**10.** The single entry by Ms. Ragland dated November 19, 1984, is discussed below.

determined that Defendant did not waive the requirement, however, the delay may be attributed to Plaintiff's failure to secure a copy of the hospital bill or at least advise Defendant of any problems encountered in obtaining same.

The Court's decision to grant Defendant's Motion necessarily implies the absence of a genuine issue of material fact which would preclude judgment for the Movant on the issue of extracontractual damages as a matter of law. Plaintiff has referenced a number of facts contained in the exhibits included in her response to the instant Motion which she urges are material and indicative of a genuine issue for resolution at trial. The Court now briefly addresses why its view is to the contrary.

■ Plaintiff points out that Defendant's home office received a claim form from Dr. A.R. Perry for anesthesia services provided Defendant at the hospital on June 11, 1984. Defendant's letter of September 4, 1984, informed Dr. Perry that his bill for services was not covered under the terms of the policy. The Court is not persuaded by Plaintiff's argument that this in some way satisfied the policy's contractual requirement that payment of the charges for the decedent's hospital confinement must have been legally required.

The Court also declines to attach materiality—for purposes of the motion now before it—to the different views espoused by Mr. Akin on the one hand and Ms. Ragland and Mr. J.H. Blackledge [11] on the other concerning the willingness of hospitals to release copies of itemized charges to insurance companies. (Akin depositions, pp. 49–53, Ragland deposition, p. 37; Blackledge deposition, pp. 11 and 18). This is because—consistent with the Court's finding above—the responsibility of furnishing evidence of the charges never shifted to the Defendant. Further, assuming arguendo

that Defendant did accept the task of obtaining a copy of the hospital bill via waiver, Defendant's mere failure to specifically solicit the bill from the hospital after November 1, 1984, and until payment of the claim was tendered plainly does not evidence the kind of intentional or grossly negligent conduct envisioned by *Veal, supra,* and other Mississippi "bad faith" case law.

A remaining issue of fact raised by the Plaintiff which deserves mention is Plaintiff's reliance on Mr. Akin's deposition testimony which maintains that the accidental death and daily income claims were processed independently despite the fact that Akin was the claims manager over both the death and health claims departments. (Akin deposition, pp. 12 and 67). Plaintiff emphasizes this alleged inconsistency, along with certain "action sheet" notations [12] made by Ms. Ragland into the decedent's health claim file, in an effort to contend that Defendant attempted "to wrongfully use its denial of the death claim as a means of not paying the daily income benefits claim when it well knew the merits of each claim were entirely separate".[13] Plaintiff cites the Mississippi Supreme Court's decision in *Travelers Indemnity Company v. Wetherbee,* 368 So.2d 829 (Miss.1979) as authority in support of its contention.

■ The Court fully appreciates the import of the *Wetherbee* holding to the effect that an insurer is subject to the imposition of punitive damages for intentionally withholding payment due on a separate item of coverage in a multi-coverage policy even though the insurer may have a legitimate or arguable reason for delaying or denying payment on another item. The facts raised by Plaintiff in this case, however, do not create a genuine issue as to whether Defendant was guilty of "bad

---

11. Mr. Blackledge is a field representative for Equifax services.

12. Ms. Ragland's notations appear as follows:
November 11, 1984
Nell has a death claim on this. Hold.—B.R. Calendar and we will then check to see what Nell has.
November 19, 1984

Hold, Nell's claim still pending.—B.R.
Nell Dollar is Defendant's Assistant Death Claims Manager.

13. Plaintiff's Brief, p. 14.

faith" in handling the daily income claim. The fact that the daily income claim and the accidental death claim were handled separately is substantiated by the Defendant's tender of full payment on the former and its denial of the latter for a legitimate reason. Akin's supervisory capacity over both claim departments does not warrant a logical inference—or the genuine issue of same—that Defendant wrongfully employed leverage in its handling of the death claim to delay payment on the daily income claim. Further, Ms. Ragland's notations of November 1, 1984 and November 19, 1984 are entirely consistent with Defendant's articulated reason for delaying payment on the daily income claim until January, 1985, i.e., Plaintiff' submission of incomplete proof to support her claim. Ms. Ragland's deposition testimony which explains that from November 19, 1984, until January 8, 1985, she "wait[ed] to see if they got it (the copy of the hospital's itemization of charges) in the death claim section" further corroborates the legitimacy of Defendant's position. (Ragland deposition, p. 41). Also, when asked by Plaintiff's counsel at her deposition "[N]ow, on your note of November 1st of 1984, you made no mention that you had not received the hospitalization statement of charges, did you?", Ms. Ragland responded, "That's correct. But we don't put every little thing down. I might—I probably asked for them over there (the death claim section) and didn't get them".

Finally, Plaintiff argues that the Court's holding in *Bankers Life and Casualty Company v. Crenshaw*, 483 So.2d 254 (Miss.1985) illustrates the Defendant's willful breach of its duty to promptly investigate and pay the daily income claim. Plaintiff cites this language found in *Crenshaw*:

> [A]n insurance company has a duty to the insured to make a reasonably prompt investigation of all relevant facts. It has a further duty, after an adequate investigation and a realistic evaluation of the claim, to tell the insured, its customer, the plain truth. And, if the insurance company cannot give its insured a valid reason for denying the claim, it has a final duty to promptly honor it.

The situation presented in the instant case may be distinguished from the caveats contained in *Crenshaw* for several reasons. First and foremost, payment in full on the daily income claim was tendered by Defendant and the claim was never denied. Second, Plaintiff was duly notified of the necessity of furnishing additional documentation by correspondence from the Defendant dated August 20, 1984 and October 18, 1984. Further, Defendant itself requested a copy of the Deceased's "transcript" from the hospital but the charges were not included in the hospital's reply. The Court is of the opinion that the investigative duty of which *Crenshaw* speaks did not arise until Plaintiff submitted a completed proof of loss on the daily income claim as required under the terms of the policy and Mississippi law. Assuming arguendo, once again, a waiver by the Defendant of the remainder of the policy's proof of loss requirement (i.e., a copy of the hospital's charges) by virtue of Defendant's October 18, 1984, correspondence, Defendant's failure to pay the claim until an inquiry was received by the Plaintiff in January of 1985 still is not illustrative of the kind of intentional or grossly negligent conduct which must exist before allowing a jury the opportunity to consider whether exemplary or other extracontractual damages should be awarded against this Defendant.

## III. CONCLUSION

The Court determines that, as a matter of law, Defendant did not act in "bad faith" and, accordingly, is not liable to the Plaintiff for punitive damages. Punitive damages, as well as compensatory damages demanded in this action for "intentional mental distress", are not recoverable where the insurer had—as the Defendant did here—a legitimate or arguable reason for delaying its eventual tender of payment on the claim in question. *Aetna Casualty & Surety Co. v. Day, supra; Mixon v. Provident Life and Accident Insurance Co.,* 616 F.Supp. 139 (D.C.Miss.1985); *O'Conner v. Equitable Life Assurance Society of U.S.,* 592 F.Supp. 595 (D.C.Miss.1984).

The Court is of the opinion that no genuine issues of material fact remain and that the Defendant's Motion should be granted.

An Order in accordance with this opinion will be entered.