# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01353-SCT

*CORTNEY JO ASHMORE McCORD*

*v.*

*HEALTHCARE RECOVERIES, INC. AND TRAVELERS INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/03/2005 |
| TRIAL JUDGE: | HON. JACQUELINE ESTES MASK |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ROY O. PARKER |
| | ROY O. PARKER, JR. |
| ATTORNEYS FOR APPELLEES: | MICHAEL DAVID TAPSCOTT |
| | CLIFFORD KAVANAUGH BAILEY, III |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 05/10/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     After an evidentiary hearing, the Lee County Chancery Court, Chancellor Jacqueline Estes Mask, presiding, found that Travelers Insurance Company and Healthcare Recoveries, Inc., were not liable to Courtney Jo Ashmore McCord for damages for alleged tortious interference with the settlement of a minor's personal injury claim. From this chancery court judgment, Courtney Jo Ashmore McCord appeals to us.  Finding no error, we affirm.

**FACTS AND PROCEDURES IN THE TRIAL COURT**[1]

¶2.    On July 2, 1995, Courtney Jo Ashmore[2] (Courtney)[3] was injured while riding an all-terrain vehicle with her female cousin on a gravel road in Prentiss County.  Courtney struck a wire cable which had been strung across the road by an adjacent landowner in order to deter passage.  When the cable caught Courtney across the neck, she was thrown violently from the vehicle.  Courtney was transported on another vehicle to a nearby residence, and from there, she was transported to the hospital.  The medical examination at the hospital revealed that Courtney had suffered severe injuries, including a neck fracture, and Courtney thereafter was required to have multiple surgeries and treatments.

¶3.    On the date of the accident,  Courtney,  as a dependent of her step-father, Michael Mask, was covered under a health plan provided by the Tennessee Valley Regional Housing Authority (TVRHA).  Michael Mask was an employee of TVRHA.  Benefits were paid under a group policy issued by Travelers Insurance Company (Travelers) to TVRHA.  Courtney incurred medical expenses in the amount of $31,904.45, of which $26,222.79 was paid pursuant to the TVRHA plan.

---

[1]Many of the facts are gleaned from Chancellor Mask's very thorough 29-page Opinion and Judgment entered subsequent to a two-day evidentiary hearing.

[2]Courtney was fourteen years old at the time of her injury.  Today, she is married, and her last name is McCord.  Courtney's mother, Betty Ashmore Mask (no relation to Chancellor Mask), was originally a party to the suit; however, Betty was dismissed as a party when Courtney came of age.  For clarity, we will refer to the plaintiff/petitioner as Courtney, even though during Courtney's minority, her mother, Betty, was acting on Courtney's behalf.

[3]The correct spelling is "Cortney."  However, since the incorrect spelling was used throughout the trial, "Courtney" will be used for consistency.

¶4.   We momentarily digress to provide here certain information concerning the pre-accident activities of certain corporate entities involved in varying degrees with today's case. Prior to the subject accident, Travelers and Metropolitan Life Insurance Company (MetLife) sold their medical insurance businesses to MetraHealth Companies, Inc. (MetraHealth) on January 1, 1995. As a part of this transaction, Travelers received approximately 48% of MetraHealth's outstanding capital stock. On October 3, 1995, Travelers sold all of its MetraHealth stock to United Healthcare Corporation (UHC). A little more than a month later, UHC entered into an agreement with Healthcare Recoveries, Inc. (HRI) to utilize HRI's services on behalf of its owned and managed plans, which included those plans managed by MetraHealth. HRI operated as a recovery service for healthcare insurance payors to identify those situations which might generate potential subrogation claims. In her opinion, Chancellor Mask added footnote 5 to further explain this agreement:

> Paragraph 5(a) of the agreement states that HRI will follow applicable law in performing services on behalf of [UHC] . . . Further, pursuant to Paragraph 7(c), [UHC] was responsible for the "correctness, completeness and accuracy of the data submitted to HRI." The contract likewise contains indemnification provisions between HRI and [UHC]. However, no cross-claims have been filed by HRI or Travelers.

¶5.   Thus, in the midst of all of this inter-corporate activity, Betty Ashmore Mask, (Betty) found herself in need of legal representation on behalf of her minor child, Courtney. Betty hired a lawyer in an effort to recover damages for Courtney's injuries. In due course, a personal injury claim was asserted against Joseph Richard Arnold, the adjacent landowner who had strung the wire cable across the road. Arnold was insured by Mississippi Farm

3

Bureau Mutual Insurance Company (Farm Bureau). We now quote from Chancellor Mask's

opinion:

> The alleged basis for this suit lies within the ensuing communications and exchange of information between the above entities and counsel for Courtney, which the Court summarizes in chronological order below.
>
> On December 12, 1995, counsel for Courtney sent a letter to MetraHealth advising of his representation of her and requesting copies of any of her medical bills which had been paid by MetraHealth.
>
> MetraHealth referred the case to HRI for possible collection in February 1996.
>
> On March 15, 1996, counsel for Courtney sent a letter to HRI forwarding "MetraHealth documents," and requesting that HRI "let [him] know about the amount of [its] subrogation lien." There is no basis in evidence for this statement by counsel for Courtney, unless the attorney made the same assumption as HRI, more particularly described below, that a subrogation claim existed in some form.
>
> On March 26, 1996, Timothy J. Partin (hereinafter "Partin"), an employee of HRI, forwarded a letter to counsel for Courtney which stated that
>
>> The contract between the Health Plan and your client provides that the Health Plan has subrogation and/or recovery rights as an insurer. In this connection, the Health Plan also has the right to be reimbursed by your client for its costs of providing medical care in the event that any compensation is received by your client. The contract also requires the full cooperation of your client in the Health Plan's efforts to obtain a recovery.
>
> The Court reviewed the video of Partin's deposition and the transcript of the same, . . . and observed that Partin explained that at the time he sent the foregoing letter he had not in fact personally reviewed the policy to determine whether it contained any subrogation language. Partin further explained that he relied on information concerning the policy which had been provided to him from an unidentified source, but which could have been provided by the client services office of HRI. Interestingly, Partin elaborated that when a file is referred to a collector at HRI, it would be uncustomary for them to review the plan language, and that "every time you pull up a file you don't run to look at the language." He also explained that the above described letter is typical of what is sent by HRI to an insured's attorney. Partin also acknowledged that

4

the language of his letter could constitute a misrepresentation. However, Partin viewed the letter as an initial attempt to gather information regarding the case, and viewed the meaning of "rights of recovery" to include more than what would be termed contractual subrogation in this State.

An excerpt of HRI's legal manual on Mississippi subrogation law was received [into evidence]; however, the excerpt reflects HRI's view on the law as of July 1999, and not the version utilized during the period under consideration. An excerpt of training materials used by HRI on this subject in January 1997 was also received [into evidence]. Both sets of material simply state that "Mississippi recognizes both equitable and contractual subrogation" and neither elaborates on the nature of either theories of recovery.

On May 3, 1996, Steve Pope (hereinafter "Pope"), the examiner for HRI who was assigned to Courtney's case, sent a letter to counsel for Courtney with copies of the total benefits paid by the plan to that date . . . Pope also advised, "Upon settlement, please include our file number on the check and include the admittance advise below." The statement of benefits which was attached to the letter instructed that checks were to be made payable to HRI.

On June 18, 1996, Pope sent a letter to counsel for Courtney which provided an updated statement of benefits paid for her. This letter is in the same format as the letter . . . described above, and included the same language regarding remitting payment to HRI.

It is uncertain at what point counsel for Courtney received a copy of the Plan Description for TVRHA.

On September 26, 1996, counsel for Courtney wrote a letter to Pope, "requesting a copy of the policy of insurance or other documentation of entitlement to subrogation."

On October 2, 1996, Pope faxed a memo to Jim Rhodes (hereinafter "Rhodes"), adjuster for Farm Bureau, advising that HRI maintained a subrogation lien in the amount of $26,222.79, and requesting that HRI be placed on the settlement check as a payee.

By letter dated October 4, 1996, Pope advised Farm Bureau that HRI "provides subrogation and/or recovery services" for Courtney's plan, and explained that "[t]he purpose of this letter is to serve as the plan's formal notice of its contractual subrogation and/or its recovery rights as set forth in its contract with its insured."

(The chancellor's references to trial exhibits are omitted from the quoted language from the chancellor's opinion.)

¶6.    Continuing with a summary of the facts set out in Chancellor Mask's opinion, Farm Bureau's counsel, by letter dated December 6, 1996, requested that the chancellor be informed of HRI's potential subrogation rights at the time of any hearing on a petition for approval of the minor's settlement.[4]  Likewise, on December 6, 1996, a representative from HRI faxed Courtney's lawyer a purported copy of a page from the applicable insurance policy documenting the fact that HRI was entitled to subrogation as to the medical expenses of $26,222.79; however, as it turned out, the faxed page was not a part of the applicable policy or plan which had paid Courtney's medical expenses.  In fact, in due course, HRI admitted that, at the time of the accident, it did not hold a medical insurance policy containing an express reservation of subrogation rights on Courtney's medical expenses.  Thereafter, on December 26, 1996, Pope, on behalf of HRI, informed Courtney's lawyer by phone that he had previously inadvertently forwarded incorrect information to him and that the plan which covered Courtney did not contain an express subrogation clause.  On the same day, Pope submitted a letter to Courtney's lawyer, and this letter contained an enclosure purporting to be a provision of the applicable policy which would entitle Travelers/HRI to subrogation.  This letter stated, inter alia:

---

[4]This action by Farm Bureau's counsel was based on this Court's decision in ***Cooper Tire & Rubber Co. v. Striplin***, 652 So. 2d 1102, 1104 (Miss. 1995) (parents could not effectively assign subrogation rights to proceeds to which only their minor child was entitled).

It is [HRI's] position that the member or his dependents are not required to pay the accident related expenses, only the tort feasor is. Thus the charges are excluded and because they were paid [by Travelers], are recoverable. In addition, Mississippi recognizes equitable subrogation which we also rely upon.

¶7. By letter dated January 2, 1997, Farm Bureau's counsel again expressed to Courtney's lawyer a concern about the subrogation issue based on *Cooper Tire*. Thereafter, on January 20, 1997, Pope submitted another letter to the Farm Bureau adjuster concerning assurances that HRI would be protected by way of being listed as a payee on any subsequent draft issued by Farm Bureau in the event of settlement of Courtney's claim.

¶8. In due course, an apparent settlement was reached on the personal injury claim, necessitating the filing of a petition in chancery court seeking authority to compromise a minor's doubtful claim (Courtney's personal injury claim). As noted by the chancellor in her opinion, the filing of this petition was on May 9, 1997, which was approximately five months after the exchange of documentation between HRI and Courtney's lawyer, and the admission by HRI that there was no applicable insurance contract containing express subrogation provisions. Courtney's lawyer wisely named HRI as a respondent in this petition based on HRI's previously-asserted right of subrogation. The petition asserted, inter alia:

[M]onies were paid to medical care providers on behalf of [Courtney], by respondent, [HRI], administrator for MetraHealth, the Petitioner's health insurer, in the amount of Twenty-Six Thousand Two Hundred Twenty-Two and 79/100 Dollars ($26,222.79). [HRI] has been made a respondent in this cause for the purpose of allowing [HRI] to come into Court and show cause as to the extent of its subrogation lien, if any.

7

In a footnote in her opinion, the chancellor observed that "[n]otably, the petition does not assert that HRI should show cause as to why it asserted a subrogation lien, but to show to what extent it held one, if any."

¶9.     At the conclusion of a hearing before Chancellor John C. Ross, Jr., on May 29, 1997, Chancellor Ross appointed Betty as Courtney's guardian; authorized Betty to settle this doubtful claim with the landowner (Farm Bureau's insured); and, authorized the disbursement of $100,000 received from Farm Bureau as settlement of the doubtful claim. Based on the subrogation dispute, Chancellor Ross ordered the sum of $26,222.79, representing the amount of medical expenses, to be held in the registry of the Court until the subrogation issue had been resolved by the court. After the authorized payment of attorneys' fees, the remaining settlement proceeds of $39,837.88 were placed into an authorized account for Courtney's benefit.

¶10.    However, on June 2, 1997, Courtney's lawyer filed an amended petition for authority to compromise the minor's doubtful claim, joining Travelers as a respondent. The amended petition alleged, inter alia:

> 5. On or about March 26, 1996, [HRI] representing [Travelers], informed [counsel for Betty] that the contract under which [Courtney's] insurance benefits were paid, had a subrogation clause which entitled them to a subrogation lien on any settlement proceeds recovered on behalf of [Courtney].
>
> 6. On or about September 26, 1996, [counsel for Betty] requested documentation of the alleged right of subrogation asserted by [HRI].
>
> 7. On or about December 6, 1996, a page from a policy of insurance page 7, was faxed to [counsel for Betty] by [HRI], which contained a subrogation clause, however, a representative from Healthcare Recoveries, Inc., later contacted [counsel for Betty] and retracted this page as being part of the policy of insurance under which Courtney Ashmore was covered.

8. [Counsel for Betty] obtained a copy of the contract between TVA [i.e., TVRHA] and [Travelers] and learned that [Travelers] did not, in fact, have any subrogation interest or a right to a lien.

Likewise, the amended petition alleged that HRI (in the stead of Travelers) had interfered with the attempted disbursement of the settlement proceeds, and that HRI continued to assert a subrogation right to the settlement proceeds, knowing that it had no subrogation rights.

¶11. So, in essence, due to the filing of Courtney's amended petition on June 2, 1997, Travelers was added as a defendant and Courtney asserted a claim of bad faith against HRI and Travelers. At this time, Courtney did not attempt to have the chancellor make a determination as to the disputed settlement proceeds (medical expenses) over which HRI asserted a subrogation lien, but instead, over the next several years, the parties engaged in discovery, and the record reveals that they had more than a few discovery disputes. Along the way, HRI removed this case to federal court, only to have a federal judge later remand the case back to state court. Also, on November 17, 1998, Courtney reached her eighteenth birthday. Eventually, by order entered on December 10, 1999, the chancellor terminated the guardianship, and the remaining monies (exclusive of the escrowed amount of $26,222.79) were released from the guardianship account. Likewise, on May 6, 2002, Travelers filed a motion for summary judgment and by order entered on October 15, 2002, Chancellor Ross denied summary judgment, and Travelers did not appeal the chancellor's ruling.

¶12. By the time of the two-day hearing which commenced on February 7, 2005, Chancellor Mask was the presiding judge inasmuch as Chancellor Ross had by that time left the bench. At the conclusion of the hearing, the chancellor took this matter under advisement and in due course, she entered her twenty-nine-page Opinion and Judgment on June 3, 2005.

In her very thorough opinion, Chancellor Mask set out the relevant facts, the procedural history of the case, and the issues before the court. The chancellor likewise meticulously addressed and analyzed each claim asserted; namely, (1) tortious interference with the settlement negotiations; (2) misrepresentation during the settlement negotiations; (3) availability of the doctrine of equitable subrogation; (4) improper assertion of subrogation; and, (5) ERISA preemption of Courtney's punitive damages claim. However, based on the manner of the deposition of the other issues, the chancellor deemed it unnecessary to address the issue of whether the Employee Retirement Income Security Act (ERISA) preempted Courtney's claim for punitive damages. *See* 29 U.S.C. § 1144(a). While the chancellor's ruling will be discussed in more detail in due course, suffice it to state here that the chancellor found that the actions of HRI/Travelers did not constitute bad faith and that "the proof was insufficient to show any harm or injury which was suffered in the ultimate settlement of the case by [HRI/Travelers's] activities during the negotiation process." The chancellor thus entered a judgment denying Courtney's claims, and it is from this final judgment that Courtney appeals to us.

## DISCUSSION

¶13.   "We have decreed on numerous occasions that '[t]his court will not disturb the findings of the chancellor unless it is shown the chancellor was clearly erroneous and the chancellor abused his discretion.'" *Ill. Cent. R.R. v. McDaniel*, 2006 Miss. LEXIS 468, *5 (Miss. 2006) (citing *Howard v. Totalfina E & P USA, Inc.*, 899 So. 2d 882, 888 (Miss. 2005); *Hill v. Southeastern Floor Covering Co., Inc*., 596 So. 2d 874, 877 (Miss. 1992); *Bell v. Parker*, 563 So. 2d 594, 597 (Miss. 1990)). "Abuse of discretion is found when the

10

reviewing court has a 'definite and firm conviction' that the court below committed a clear error of judgment and the conclusion it reached upon a weighing of the relevant factors." *Id.* at *6 (citing *Howard*, 899 So. 2d at 888; *Caracci v. Int'l Paper Co.*, 699 So. 2d 546, 556 (Miss. 1997)).

¶14.    We will briefly paraphrase the issues as presented by the parties. Courtney asserts the issues to be: (1) whether the chancellor abused her discretion and was manifestly wrong in finding that HRI and Travelers were not liable, notwithstanding their false misrepresentations of a valid subrogation lien in order to have Farm Bureau list HRI as a payee on the settlement check; (2) whether HRI and Travelers had an arguable reason to pursue their subrogation claim on the disputed medical expenses of $26,222.79, which had been interpled into court; and, (3) whether HRI and Travelers should be liable for actual and punitive damages for their actions. HRI presents the issues as: (1) whether Courtney proved all the elements of her claim; (2) whether HRI is liable for bad faith and tortious interference due to its equitable subrogation claim; and, (3) whether Courtney's claims are preempted by ERISA. Although stated differently, Travelers basically mirrors HRI's issues.

¶15.    Like the chancellor, based on our disposition of certain issues, we deem it unnecessary to discuss whether ERISA preempts any of the claims asserted in today's case. As to the issues we deem appropriate to discuss, we restate these issues for the sake of clarity in discussion.

11

## I. WHETHER HRI AND TRAVELERS TORTIOUSLY INTERFERED WITH THE SETTLEMENT BY INITIALLY ASSERTING CONTRACTUAL SUBROGATION.

¶16. Courtney alleges that HRI and Travelers tortiously interfered with her settlement with Farm Bureau by means of gross negligence and intentional misrepresentation that contractual subrogation existed as a basis for its claim, when such did not in fact exist in the policy. Furthermore, Courtney claims she is entitled to punitive damages pursuant to *Valley Forge v. Strickland*, 620 So. 2d 535 (Miss. 1993). The chancellor disagreed and defined tortious interference as:

> "Tortious interference" is any intentional invasion of, or interference with, economic, property or contractual rights, causing injury without just cause or excuse. See 45 Am.Jur.2d, *Interference*, § 1.

¶17. This Court has established the following elements of intentional or fraudulent misrepresentation: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, *and* (9) his consequent and proximate injury." *Franklin v. Lovitt Equip. Co., Inc.*, 420 So. 2d 1370, 1373 (Miss. 1982) (citing *Hamilton v. McGill*, 352 So. 2d 825 (Miss. 1977); *McMahon v. McMahon,* 247 Miss. 822, 157 So. 2d 494 (1963); *Anderson Dunham, Inc. v. Aiken*, 241 Miss. 756, 133 So. 2d 527 (Miss. 1961)). (Emphasis added). Likewise, these elements must be proved by clear and convincing evidence. *Franklin*, 420 So. 2d at 1373 (citing *Parker v. Howarth*, 340 So.

12

2d 434 (Miss. 1976); *Crawford v. Smith Bros. Lumber Co., Inc.*, 274 So. 2d 675 (Miss. 1973)).

¶18.   Chancellor Mask found that Courtney's claim of misrepresentation during the settlement negotiations did not meet the *Franklin* elements by clear and convincing evidence; thus, Travelers and HRI were not liable for tortious interference.  En route to this finding, Chancellor Mask stated, inter alia:

> Of particular concern to the Court is that during the negotiation of a settlement by counsel for Courtney with [Farm Bureau], a representative of HRI faxed to counsel for Courtney an excerpt from a different policy which contained an express subrogation provision.  It is obvious that HRI should have done its homework before sending bogus information to Courtney's attorney.  As described above, HRI later retracted this representation and maintained its position that it held a claim by way of equitable subrogation.
>
> . . . .
>
> It is undeniable that HRI should have known that the contractual subrogation information that was being provided to Courtney's attorney was false.  The Court is disturbed that HRI's usual procedures did not call for verification on the part of its representatives that the Plan contained express subrogation language prior to its claiming that means of recovery.  The notion suggested by [Courtney] is that HRI carelessly assumed the risk of any fallout from this misrepresentation because, in part, it did not think a Mississippi attorney would have detected the false claim and, further, it was unconcerned about Courtney's care and well-being.  This Court is likewise concerned that an out-of-state entity would engage in such behavior to the possible detriment to the citizens of this State.  The Court is further concerned that HRI insisted on its name being placed on the settlement check prior to an adjudication of its entitlement.
>
> Despite the foregoing, the Court is bound by an oath to faithfully and impartially apply the law to the facts of this case.  While HRI's actions were inappropriate, the Court is unable to discern any damages which were suffered because of this misrepresentation.  Similar to the findings of Judge Pickering

13

in ***McArthur v. Time Ins. Co.,***[5] 889 F. Supp. 938 (S.D. Miss. 1995), which dealt with a somewhat analogous situation to the present dispute,[] the Court finds that erroneous information was submitted, but finds no damages which are attributable to the false information.

From a review of the evidence, it is undisputed that Courtney's decision to settle the case was not prompted by the actions or false information of the Respondents, as described above. Likewise, there was no evidence that the Respondents' actions had any impact on the amount of the settlement. Further, the communication was with Courtney's attorney and the right of the attorney to rely on this information, while having access to the Plan, is less than it would have been where the communications had been with an unrepresented person. The Court finds that HRI's erroneous assertion of contractual subrogation was corrected and withdrawn by HRI during the negotiation process between Ashmore and Farm Bureau, and some five (5) months prior to the filing of the first petition. HRI's letter clarifying the nature of their claim was received by [Courtney's] counsel in December 1996, and the doubtful claim hearing was held in May 1997. Separately from the assertion of contractual subrogation, HRI has consistently asserted a claim for rights of recovery under whatever form available. Additionally, Farm Bureau recognized a potential claim of HRI, arising not solely from HRI's erroneous communication, but from the Supreme Court's holding in ***Cooper Tire***.

---

[5]In ***McArthur***, it was first represented by the insurer and its agents that the health insurance policy contained an express subrogation provision, when such provision was non-existent, and subsequently it was asserted that the insurer held a claim of equitable subrogation. Judge Pickering, in addressing the initial false information and the insured's allegations relating thereto, explained that "[n]ot every unpleasant or irritating thing that occurs to one in life is the basis for a lawsuit and punitive damages. The fact that two parties disagree over their respective legal rights does not in every instance automatically give cause for a bad faith lawsuit. The fact that one who contracts with another takes a position that cannot legally be maintained by and of itself does not give reason to file suit. Plaintiff has been out no money and suffered little if any injury. His testimony demonstrates that he was not personally involved in the subrogation dispute to any great extent. Most of the correspondence occurred between Defendant Time and the carrier for the third party tortfeasor or with Plaintiff's attorney." ***McArthur***, 889 F. Supp. at 945. He further found that "[r]egardless as to what happened, however, Plaintiff has not demonstrated that Defendant. . .caused Plaintiff any injury." ***Id.*** (This footnote is a verbatim quote of Chancellor Mask's footnote 11 appearing at the bottom of pages 19-20 of her Opinion and Judgment).

Accordingly, the Court finds that [Courtney's] claim on this ground should be DENIED. However, as explained above, a different result would likely have been reached under a different set of facts.

¶19.   In her opinion, Chancellor Mask relied heavily on this Court's decision in *Valley Forge Ins. Co. v. Strickland,* 620 So. 2d 535 (Miss. 1993).  We discuss here the relevant facts of *Valley Forge*.  Darlene Strickland, a resident of Louisiana, applied with Valley Forge Insurance Company for an automobile liability policy, and a temporary binder was issued to provide coverage while Strickland's application underwent further review concerning permanent coverage.   The binder provided, inter alia, $50,000 in uninsured motorist coverage, and $5,000 in medical payments coverage.  While the binder was in effect, a tragic automobile accident occurred in which Strickland's twelve-year-old daughter was severely injured.  The accident occurred in Jackson County, Mississippi, and the driver of the car in which Strickland's daughter was a passenger was a relative who was a Mississippi resident. This relative/driver had a $25,000 liability policy with Nationwide Insurance Company. Valley Forge eventually paid Strickland the policy limits of $55,000, and Nationwide thereafter offered to settle by payment of its policy limits of $25,000, but only if Valley Forge would waive any subrogation rights based on Valley Forge's payment to Strickland. However, Valley Forge refused to waive its subrogation rights. *Id.* at 537-38.  Valley Forge eventually filed a declaratory judgment action in Jackson County Chancery Court to determine the issue of the validity of its subrogation claim.  Strickland counterclaimed, alleging, inter alia, that Valley Forge was guilty of tortious interference and bad faith.  In due course, the chancellor denied Valley Forge's subrogation claim, thus finding that Strickland was entitled to the $25,000 payment under the Nationwide policy.   The chancellor

15

additionally found, inter alia, that Strickland was entitled to $1,000,000 in punitive damages from Valley Forge on the tortious interference/bad faith claim. *Id.* at 538.

¶20.    On appeal, this Court affirmed. *Id.* at 543.[6] In the case sub judice, Chancellor Mask's opinion detailed the facts in *Valley Forge*, and then distinguished today's case from *Valley Forge* by stating, inter alia:

> The chancellor found, with regard to the declaratory action, that under Louisiana law and the provisions of the policy, Valley Forge was not entitled to subrogation or offset, and with regard to the counterclaim, found that (1) the Stricklands were entitled to the $25,000.00 benefit under Aull's policy with Nationwide; (2) Valley Forge must tender another payment of $55,000.00 to the Stricklands as a result of its failure to obtain prior court approval for the previous payment; and (3) awarded $1,000,000.00 to the Stricklands, and an additional $1,000,000.00 "payable only if Valley Forge failed to satisfy certain corrective and preventive measures described in the judgment. . . ."
>
> The chancellor found that "*Valley Forge has engaged in a bad faith effort to assert in Mississippi a contention Valley Forge knows it cannot successfully assert in Louisiana, the state where the contract was made*." (Emphasis added by Justice Lee.) *Id.* at 539.  Valley Forge breached its duty by asserting a "meritless subrogation claim."  However, it is critical to identify what made the subrogation claim "meritless."  Valley Forge attempted to obtain the advantage of Mississippi statutory offset rights set forth in Section 83-11-107, though the insurance policy was executed in Louisiana, and "[t]he claim that a Mississippi court would apply Mississippi statutory law is patently untenable." *Id.* at 540.  Further, "Valley Forge knew. . .that the subrogation agreement signed. . .by the Stricklands [in connection with their receipt of the payment from Nationwide] was void. . . .Valley Forge knew Louisiana law did not permit subrogation or offset until after the insured is made whole. *Id.* at 539.  Accordingly, the facts supported the finding that Valley Forge acted with "gross negligence in filing and maintaining a groundless lawsuit," to the detriment of the minor child. *Id.* at 540.[]

---

[6]In actuality, in *Valley Forge*, this Court affirmed in part, and reversed and rendered in part, the chancellor's final judgment.  However, concerning the chancellor's rulings as discussed in this opinion, this Court affirmed.  It was only with regard to the chancellor's ruling on an issue not relevant to the disposition of today's case that this Court reversed and rendered.

Unlike the case at hand, Valley Forge initiated legal action to promote a claim that was clearly groundless from the outset and did not retreat from its position.

¶21. We agree with the chancellor that Travelers and HRI did not tortiously interfere with the settlement through gross negligence or intentional misrepresentation, because Courtney suffered no damages from the incorrect assertion of contractual subrogation. Furthermore, we find that the chancellor correctly distinguished this Court's holding in *Valley Forge* from today's case – Travelers and HRI retreated from their incorrect assertion, whereas Valley Forge did not. Thus, this issue is without merit.

## II. WHETHER TRAVELERS AND HRI TORTIOUSLY INTERFERED WITH THE SETTLEMENT BY CONTINUOUSLY ASSERTING EQUITABLE SUBROGATION.

¶22. Even though Travelers and HRI eventually abandoned their contractual subrogation claim, they continued to pursue an equitable subrogation claim, which Courtney asserted constituted bad faith on the part of Travelers and HRI.

¶23. Travelers and HRI argue that *Valley Forge* is not dispositive of this issue because this Court did not reach the question of equitable subrogation in that case. Futhermore, Travelers and HRI argue that a more recent case encourages assertion of a claim for equitable subrogation, namely *Cooper Tire & Rubber Co. v. Striplin*, 652 So. 2d 1102 (Miss. 1995). Chancellor Mask likewise provided a detailed analysis of *Cooper Tire* in her opinion.[7]

_____

[7]*Cooper Tire* does not answer the question of whether Mississippi recognizes equitable subrogation in the context of a health insurance policy. *Cooper Tire* simply suggests that Mississippi might recognize this theory of recovery.

17

In *Cooper Tire*, a minor child (Striplin) was injured by an uninsured motorist while riding his bicycle. The father's insurer (Cooper Tire) paid $12,472.80 to medical providers pursuant to his health care plan. In connection with these payments, the parents executed Receipt and Subrogation Agreements which subrogated the insurer to their rights of recovery for the injury against any person or corporation. The father's automobile insurer (Aetna) thereafter agreed to pay Striplin the sum of $75,000.00 pursuant to the father's uninsured motorist coverage. Cooper Tire asserted a claim against that sum in the amount equal to what it had paid to medical providers, which Striplin rejected, citing the lack of prior court approval of the subrogation agreement. The Chancellor held that the post-claim subrogation agreement was invalid as to the child because it lacked prior court approval, and Cooper Tire appealed. In affirming the chancellor, the Supreme Court stated that "[i]f Cooper Tire is due consideration, it would be based upon its own equitable claim for reimbursement of necessary medical expenses under the doctrine of quasi-contract. Because Cooper Tire raised this claim on appeal, but did not raise it below, the issue is now waived." *Id.* at 1104. Based on the Supreme Court's explanation that the child's health insurer could have raised an equitable claim for reimbursement in the trial court, it is understandable that Farm Bureau, and HRI, would have viewed the situation at hand as giving rise to that form of claim. However, because the Supreme Court did not take up the issue of equitable subrogation in this context, this holding has limited applicability on that item.

Chancellor Mask then held:

> Based on the foregoing analysis, the Court finds that the holding in *Valley Forge* should not be strained to forbid the assertion of equitable subrogation in the context of a Mississippi health insurance policy. Further, that case does not support a cause of action where contractual subrogation was erroneously asserted, then withdrawn, during the negotiation process.

> . . . .

> [The issue is] whether [Travelers and HRI] exhibited "bad faith" by [their] asserting equitable subrogation, or otherwise engaged in tortious behavior in their assertion of a subrogation claim.

> In order to establish a claim of bad faith, [Courtney] must prove: (1) lack of a "legitimate or arguable reason" for asserting a right to subrogation, and (2) commission of a willful or malicious wrong or action with gross and reckless disregard for the insured's rights. *Dixie Ins. Co. v. Mooneyham*, 684 So. 2d 574, 583 (Miss. 1996); *Life & Cas. Ins. Co. v. Bristow*, 529 So. 2d 620, 622

18

(Miss. 1988). The Court previously described the elements of a claim for tortious interference with a settlement.

The Court's findings above regarding the availability of equitable subrogation obviate the need for extensive discussion concerning whether HRI's assertion of that doctrine was legitimate or arguable.[8] Based on the lack of controlling case law, and other factors set forth below, the Court finds that HRI's actions in asserting this doctrine were neither tortious nor in "bad faith."

Counsel for [Courtney] referred to HRI's subrogation interest in communications with MetraHealth prior to the alleged tortious assertion of contractual subrogation by HRI. Additionally, as referred to earlier in this opinion, several months prior to the filing of the first petition, Farm Bureau expressed concern to counsel for Courtney that [Travelers and HRI] may have a subrogation claim in some form based on the *Cooper Tire* case, as discussed above. Thus, the insurer for the tortfeasor, reacting to the recent (though now ten-year old) rulings of our Supreme Court, expressed independent concern over the possibility of a subrogation claim by the health insurance provider for the victim.

HRI's pursuing a potential legal position concerning equitable subrogation, though unsuccessfully, does not in itself expose them to liability. *Valley Forge*, at 539 ("[F]iling a complaint to resolve a legal issue is not to be considered bad faith merely because the issue is ultimately resolved against the insurer.") (citing *Employers' Mutual Casualty Company v. Tompkins*, 490 So. 2d 897 (Miss. 1986)). The Court finds that [Travelers and HRI] had a legitimate or arguable reason for asserting a right to equitable subrogation, though they did not succeed on their claim. Cf. *Dimeo v. Gesik*, 197 Or.App. 560, 106 P.3d 697 (Or. Ct. App. 2005).[]

It is undisputed that the potential case against Arnold was settled with Farm Bureau for reasons other than the potential claims asserted by HRI or Travelers. The Court finds that neither HRI's nor Travelers' actions affected [Courtney's] decision to elect to settle the case rather than timely pursuing her claim to a trial on the merits against the tortfeasor. Since [Courtney's] settlement was for full policy limits, HRI's involvement did not affect the amount of settlement. Thus, the proof was insufficient to show any harm or

---

[8]Chancellor Mask devoted an entire section of her opinion to holding that Travelers and HRI could not rely upon the doctrine of equitable subrogation based on the holdings of other states' courts. However, that is not an issue on appeal because Travelers and HRI relinquished any and all subrogation claims.

injury which was suffered in the ultimate settlement of the case by [Travelers's and HRI's] activities during the negotiation process.

With regard to the claim that the alleged tortious conduct of [Travelers and HRI] delayed Courtney's access to the settlement funds, the Court finds that the funds were deposited in the Court's registry on the joint petition filed on behalf of Courtney and Farm Bureau. Prior to HRI or Travelers being served with process, an order was entered directing the deposit of the funds. Negotiations between the parties continued following the remand from Federal District Court in 1998. See Exhibit 35. In the letter received as Exhibit 35, dated December 7, 1998, counsel for HRI requested that the Petitioner dismiss the complaint against HRI because of HRI's "decision to forego any claim against the funds being held by the Chancery Court." Counsel for HRI further stated that "I have also suggested to you on several occasions since the summer of 1997, that, because [HRI] is waiving its subrogation lien, it be dismissed as a defendant." As described above, the damages which are now cited by [Courtney] as a basis for relief were not suffered until after the filing of the second petition. The Court finds no basis in evidence that the delays in bringing the matter to a final hearing were primarily attributable to either party.

¶24. We agree with the chancellor. In accordance with this Court's decisions in *Mooneyham and Bristow*, Travelers and HRI had a "legitimate or arguable reason" to believe that equitable subrogation might have been available to them, based on this Court's language in *Cooper Tire*. Additionally, in accordance with *Tompkins*, we hold that requesting a court to decide whether equitable subrogation is a viable theory of recovery does not in itself equate to the "commission of a willful or malicious wrong or action with gross and reckless disregard for the insured's rights." Thus, Travelers and HRI did not act in bad faith to tortiously interfere with Courtney's settlement; therefore, this issue is without merit.

20

¶25. The chancellor did not err in holding that Travelers and HRI did not tortiously interfere with Courtney's settlement by incorrectly asserting contractual subrogation, because Courtney suffered no damages. Likewise, the chancellor did not err in holding that Travelers and HRI did not tortiously interfere with Courtney's settlement by asserting equitable subrogation, because Travelers and HRI could have plausibly believed that equitable subrogation was a valid claim pursuant to this Court's holding in *Cooper Tire*. Furthermore, Travelers and HRI had the right to have a court decide whether equitable subrogation was a viable theory of recovery. For these reasons, we find that the Chancellor did not abuse her discretion; therefore, we affirm the final judgment of the Chancery Court of Lee County.

¶26. **AFFIRMED.**

**SMITH, C.J., WALLER, P.J., AND DICKINSON, J., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, P.J., AND RANDOLPH, J.**

**EASLEY, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶27. After reviewing this Court's opinion in *Cooper Tire & Rubber Co. v. Striplin*, 652 So. 2d 1102 (Miss. 1995), I cannot fully concur with the plurality's analysis and holding in this case. This case is unquestionably distinguishable from our holding in *Cooper Tire*. In *Cooper Tire*, the Court considered a fundamentally different set of facts regarding the question of subrogation of a minor's rights to the settlement proceeds, which apparently prompted the Court's dicta relied upon by the plurality.

¶28. Cooper Tire was the employer of Striplin's father when Striplin was injured by an uninsured motorist. *Cooper Tire*, 652 So. 2d at 1103. Cooper Tire, a self-insured company, paid Striplin's medical providers $12,472.80 pursuant to the terms of an employee pension and insurance program. *Id*. Striplin's parents agreed to settle Striplin's uninsured motorist claim for $75,000 under the parents' Aetna policy. *Id.*

¶29. Striplin's parents also executed receipt and subrogation agreements with Cooper Tire in connection with the payments for Striplin's medical expenses paid by Cooper Tire. *Id.* However, the parents did not seek prior court approval before executing the subrogation agreement. *Id*. The chancellor determined that the subrogation agreement was invalid and ordered the return of the money withheld and paid to Cooper Tire pursuant to the subrogation agreement. *Id*. at 1104. This Court affirmed the chancellor's decision, stating:

> In *McCoy*, we held that a parent may not assign his child's rights to proceeds derived from an insurance policy to a third party rendering medical care to said child because the parent had no right to, or interest in, the proceeds. We extended *McCoy's* holding in *Marsh* by requiring parents to obtain chancery court approval prior to the assignment of a child's rights to proceeds.

> By executing subrogation agreements, Mr. and Mrs. Striplin impermissibly attempted to assign away Striplin's rights to a portion of uninsured motorist proceeds due him. As Striplin was the only party entitled to those proceeds via his injuries, his parents had no right to assign them to Cooper Tire absent prior court approval. *McCoy* [ *v. Preferred Risk Ins. Co*.], 471 So. 2d [396] at 398 [(Miss. 1985)]. Thus, the court did not err by failing to enforce the agreement.

*Cooper Tire*, 652 So. 2d at 1104.

¶30. Here, Travelers and HRI admit that they never had a subrogation agreement with Courtney or Courtney's parents, not even an invalid subrogation agreement as in *Cooper*

22

*Tire*.  Further, Courtney, as Striplin in *Cooper Tire* was a minor, therefore prior court approval was required prior to any assignment of Courtney's rights to the proceeds.  As the facts of this case are so clearly distinguishable from *Cooper Tire*, I do not agree that Travelers and HRI had an arguable claim of equitable subrogation based on our holding in *Cooper Tire*.  I agree that the plurality is correct in its affirmance of the chancellor's finding that Travelers and HRI did not have an equitable claim for subrogation against Courtney.  However, I would reverse the chancellor's decision denying Courtney's bad faith claim and remand for further proceedings consistent with this opinion for the reasons stated herein.

**DIAZ, P.J., AND RANDOLPH, J., JOIN THIS OPINION.**