KING, Justice,
dissenting:
¶ 36. Because the majority misinterprets the antitrust statutes, I disagree with the majority’s determination that Cook Timber failed to present sufficient evidence to support an antitrust violation, and I therefore respectfully dissent.
¶ 37. Georgia Pacific (GP) contends that the verdict in favor of Cook Timber Company (CTC) was. not supported by the evidence because Dr. William Shughart failed to establish that GP was a monopolist, and CTC did not present evidence showing that GP was engaged in a conspiracy, even after Dr. Shughart testified that GP must have conspired with another party to have successively driven down prices. We find that there was sufficient evidence for the jury to find that GP violated Mississippi Code Section 75-21-3. See Miss. Code Ann. § 75-21-3. (Rev.2009).
¶ 38. Mississippi Code Section 75-21-3 states:
Any corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever, who, with intent to accomplish the results herein prohibited or without such intent, shall accomplish such results to a degree mimical to public welfare, and shall thus:
(a) Restrain or attempt to restrain the freedom of trade or production;
[[Image here]]
(c) Or shall engross forestall or attempt to engross or forestall any commodity
[[Image here]]
Miss.Code Ann. § 75-21-3 (Rev.2009).
¶39. To analyze a restraint-of-trade claim, this Court applies the rule of reason. In Brown v. Staple Cotton Co-op Association, 132 Miss. 859, 96 So. 849, 855 (1923), this Court found that a restraint on a business’s trade will not be void unless the restraint was unreasonable or there was, an undue restraint of trade. “It must be such a restraint of trade as is detrimental to the public interest.” Id. at 855.
¶ 40. This Court reviews a trial court’s denial of a judgment notwithstanding the verdict (JNOV) de novo. Mine Safety Appliance Co. v. Holmes, 171 So.3d 442, 446 (Miss.2015). We view the evidence in the light most favorable to the nonmoving party. Union Carbide Corp. v. Nix, Jr., 142 So.3d 374, 384 (Miss.2014). “When determining whether the evidence was sufficient, the critical inquiry is whether the evidence is of such quality that reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions.” Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara, 908 So.2d 716, 726 (Miss.2005) (citing Jesco, Inc. v. Whitehead, 451 So.2d 706, 713-714 (Miss.1984)) (emphasis in original). “Thus, this Court considers whether the evidence, as applied to the elements of a party’s case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.” Estate of Jones v. Phillips ex rel. Phillips, 992 So.2d 1131, 1146 (Miss.2008) (citing Spotlite Skating Rink, Inc. v. Barnes, 988 So.2d 364, 368 (Miss.2008)).
¶41. .The'majority finds.that CTC’s claims do not fit within Section 75-21-3. In finding so, the majority completely ignores the plain language of the statute and cites with authority caselaw interpreting an entirely different provision. Beginning *128 with the language of subsection (c), this subsection prohibits engrossing, forestalling, or attempting to engross or forestall any commodity. The majority states that this Court held that [an older version of the statute] prevented businesses from fixing prices for commodities outside the law of supply and demand. For instance, that prohibition precluded an agreement between oyster sellers always to sell oysters at a fixed price. While the current version of the statute does not contain the phrase price fixing, engross, in the antitrust sense, means “to buy large quantities of (a stock or commodity) in an effort to corner the market and control the price. But this case involves Georgia Pacific’s actions as a consumer, not a, seller.” Maj. Op. ¶ 15. The majority erroneously cites. Barataria Canning Co. v. Joulian for this proposition. Barataria Canning Co. v. Joulian, 80 Miss. 555, 31 So. 961 (1902). The Court in Barataría, examined the prohibitions against limiting, increasing, or reducing the price of a commodity, not the prohibition against forestalling or engrossing Further, the majority’s emphasis on GP being a consumer, and not a seller, is curious, because both engrossing and forestalling refer to buying behavior. To engross historically meant “[t]o buy large quantities of (a stock or commodity) in an effort to corner the market and control the price.” Engross, Black’s Law Dictionary (10th ed.2014) (emphasis added); Village Food & Liquor Mart v. H & S Petroleum, Inc., 254 Wis.2d 478, 647 N.W.2d 177, 184, 184 n. 10 (2002) (quoting 4 William Blackstone, Commentaries on the Laws of England, ch. 12, at 159 (1778) as defining engrossing as “buying up large quantities of corn or other dead victuals, with the intent to sell them again. This must of course be injurious to the public, by putting it in the power of one or two rich men to raise the price of provisions at their own discretion.” (emphasis added)). To.“forestall” historically meant “[t]o buy (goods) for thé purpose of reselling at' a higher price. At common law, this was an indictable offense,” Forestall, Black’s Law Dictionary (10th ed.2014) (emphasis added); Village Food & Liquor Mart, 647 N.W.2d at 184 n. 8 (quoting 4 William Blackstone, Commentaries on the Laws of England, ch. 12, at 158-59 (1778), defining “forestalling the market” as “buying or contracting for any merchandise or victual coming in the way to market, or dissuading persons from bringing their goods to market; or dissuading persons from bringing their goods or provisions there; or persuading them to enhance the price, when there: any of which practices make the market dearer to the fair trader.” (emphases added)). Clearly, subsection (c) contemplates — indeed it entirely encompasses— buying behavior in its prohibition. The majority emphasizes that Georgia Pacific cannot be engrossing because it is not attempting to corner the market when it is not a seller in that market.[24] While it is *129 true that engrossing and forestalling often traditionally involved reselling goods at a higher price, the point the majority misses is that the antitrust statutes have for hundreds of years applied to purchasing behavior that harmed the natural' course of. trade and was inimical to the public welfare.
¶ 42. As for subsection (a), the majority finds that “[n]o authority supports the view that, before this statute’s adoption, businesses were prohibited from seeking to purchase material for the lowest possible cost.” Maj. Op, ¶ 14. As described above, businesses have long been prohibited from certain purchasing behavior, including certain behavior to purchase at low prices. Moreover, when a business engages in purchasing behavior in an intentional attempt to manipulate the market, it is potentially a restraint of trade and thus a violation of the antitrust statute. Certainly, the example given by the majority of a consumer “stockpiling” a resource when the market for that resource is naturally low in an effort to lower long-term costs would not likely run afoul of the antitrust statutes. However, the evidence in this case supports the conclusion that GP, a major consumer of the commodity at issue, was not simply taking’ advantage of a naturally low market, but was attempting to manipulate and control what would have otherwise been natural market prices for the commodity it needed. When evidence of attempts to manipulate and control the market exist, such behavior may fall within the ambit of a restraint of trade under the antitrust statutes, whether such behavior was committed by a reseller or a “mere” consumer. Thus, I disagree with the majority’s misinterpretation of the antitrust statute, and believe that we must examine the evidence before us..
¶43. CTC argues that GP possessed buyer power and used this buyer power to restrain trade through several outlets: (a) its Project Hawker program; (b). the use of core/preferred suppliers; (c) its exploitation of inventories at its mills; (d) the-circulation of price lists to competitors; and (e) its docking and culling procedures and policies.
A. Project Hawker
¶ 44.' CTC claimed that GP implemented a program called Project Hawker to drastically reduce wood prices. While the record is not clear as to what exactly Project Hawker is, several GP internal documents made reference to the program.
¶ 45. A memo with the subject “Operation Hawker” stated “I am getting reports that some of the competition is pulling their price down about as fast as we are. I am of the opinion that we are the ones making the difference arid everyone else is following. We only have one objective, deliver the cheapest log possible to the plants.”
¶ 46. Another intracompany memo entitled “Project Hawker (Wood Cost Reduction)” read “[w]ood cost came down 1% on the average which translates into a savings to G-P of approximately $45 million over a quarter or $175 million on an annualized basis.”
¶ 47. Noel Tulmison, a current GP employee, testified that he did not know what Project Hawker was but only that GP wanted to reduce its prices. Roy West, a former GP manager, testified that the program was an initiative to reduce prices. According to West, wood products had been at a historic high and GP wanted to reduce its costs due tp predictions that the demand for GP products would not be high for the next few years.
¶ 48. Dr. Shughart. testified- that Project Hawker was a means for GP to reduce its prices by seven percent but that GP far exceeded a seven percent decrease in *130 prices. Dr. Shughart found that, before GP implemented Project Hawker, in March 1998 and several weeks before, CTG received $33.50 per ton for pine pulpwood. ⅝ When the program was implemented, the price was reduced to $28 per ton until the end of May, when the price remained in the low-to-mid twenties. CTC continued to receive about $20 per ton until GP informed CTC that it would discontinue purchasing pine pulp from CTC.
B.Core Supplier Program
¶ 49. GP instituted a core supplier program whereby it reduced, the number of suppliers from which it bought wood. CTC was not chosen as one of the core suppliers and argues that GP’s ability to terminate its relationship with so many suppliers demonstrates the market power GP possessed and its ability to manipulate the market. An example of the emails regarding the core supplier program stated:
I want you folks to pick the suppliers you want to do business with and give them a GOOD- quota, one they can make a living with. If they are not consistent suppliers, get rid of them. They will help drive the price down-. The discipline is going to come when they offer you the wood cheaper than you have agreed .to pay your steady suppliers.
MAKE THEM EAT IT.
¶ 50. A separate email stated:
Choose suppliers you can trust and give them quota, with the expectation of receiving wood from them when we need it, at our price.
¶ 51. However, according to West, the core supplier program was a concept that GP instituted to have as few suppliers produce as much wood as GP needed to operate its facilities. West''claimed that at one point, GP had close to 200 suppliers, but approximately forty suppliers now produced eighty percent of GP’s wood.
C.Exploitation of Inventory
¶ 52. CTC claims that'GP increased its inventory by filling its mills to the maximum so that when suppliers hauled their wood to the mill, they were forced either to receive a lower price for their wood or to have their delivery rejected. Examples of several GP emails regarding inventory read:
Inventory remains our major barometer. We are willing to push prices because we have the inventory to do so and that is what we said we would do. It is not our plan to get below our strategic inventory level.
[0]ur procurement strategy is founded on maintaining- target inventories. Stick to them unless you have a plan to pull down prices at a location. We use these inventories to “walk away from deals.”
Without inventories, we have little leverage "that -will let us “walk away from deals.”
Most of our inventories are at or above target which should give us added confidence that we can bring prices down without unnecessary downtime. I want to re-iterate, we are willing to take any solid wood facility down if we can’t make money or feel we can greatly lower future wood cost as a result of the closure.
D.Distribution of Blue Sheets
¶ 53. GP created blue sheets, or price lists, identifying the maximum price each mill would pay for each type of fiber. "The blue sheets were posted on the internet, sent to GP’s suppliers, and sent to several wood processing companies that supplied wood to GP. CTC asserts that GP violated its own antitrust compliance policy by distributing the blue sheets, "with every price for each type of fiber, to its competitors. GP’s Antitrust Compliance • Policy states:
*131 No employee may: (a) send any price list to, or receive any price list from, a competitor (other than a price list received from a regular supplier or sesnt to a regular customer regarding the products supplied or sold).
¶ 54. This provision explicitly prohibits GP from sending its blue sheets to its competitors; however, this provision allows GP to send blue sheets to its regular customers. Ricky Kelly, a former GP manager, testified that the blue sheets were sent to competitors that regularly-sold wood to GP. CTC argues that the distribution was a violation because all of GP’s competitors would know the prices GP paid for all of its wood products, including the wood products the competitors did not supply to GP. As a result, other wood companies could decrease their wood ■ prices to compete with GP.
E. Docking and Culling Procedures
¶ 55.’ In the purchase plant agreement, GP had the right to “dock” or deduct from CTC’s final payment the prices of any wood that was rotten or had a defect. When the wood was hauled to GP mills, GP measured the wood and made, any deductions.. There was conflicting testimony regarding whether actual measurements or estimations were made as to the damage on each log. Dennis Hough, a former procurement manager of GP, testified that GP employees never measured the actual defect but only estimated how vast the deduction was. Kelly, however, testified that each log was measured.
¶ 56. After the wood was measured, GP made deductions based on the location and extent of the defect. In the purchase plant agreement, GP was allowed to retain the wood that did not meet its specifications. CTC claims that this practice allowed GP to lower wood prices because first, GP could deduct payments without allowing truckers to ensure that the wood did not meet GP specifications and second, CTC was not paid for the defective wood although GP processed the wood and used it as “chip n saw.”
¶ 57. Viewing the evidence in the light most favorable to the verdict, it is' clear that CTC presented sufficient evidence to sustain an antitrust claim under the Mississippi Antitrust Act. Reasonable and fair-minded jurors could have come to different conclusions regarding whether GP engrossed, forestalled, or attempted to engross or forestall a commodity, and whether GP. restrained or attempted to restrain the freedom of trade or production.
¶58. I" also believe that this Court should affirm the trial court regarding the issues of expert testimony, the jury instructions, and punitive damages. Because of the lack of guidance on the punitive damages issue, I will address my views on how we should resolve the issue.
¶ 59. Mississippi Code Section 75-21-39, regarding the applicability of the chapter, explicitly provides that “[t]his chapter shall be liberally construed in all courts to the end that trusts and combines may be suppressed, and the benefits arising from competition in business preserved to the people of this state.” Miss.Code Ann. § 75-21-39 (Rev.2009). Thus, the Legislature has specifically mandated that we liberally construe Section 75-21-9 when interpreting it.
¶ 60. In 1906, the Legislature added a fine for the violation of the antitrust statutes. Miss.Code Ch. 145, § 5007 (1906). The statute stated that “[a]ny person injured or damaged by a trust and combine as herein defined, or its effects direct or indirect, may; in each instance of such injury or damage, recover the sum of five hundred dollars, and all actual damages[.]” Id. The chapter also included an entirely separate penalty per violation that an enti *132 ty violating the chapter must pay, recoverable by-the. State, rather than what an individual injured may recover. Miss. Code Ch. 145, § 5004 (1906) (Any one “violating any of the provisions of this chapter, shall forfeit not less than two hundred dollars nor more than five thousand dollars for every such offense, and each day such person, corporation, partnership, or association shall 'continue to do so shall be a separate offense[.]”). In 1926, the Legislature changed this language to state: “Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it whether or not inimical to public welfare and in addition a penalty of five hundred dollars ($500.00)[.]” Miss. Gen, Laws Ch. 182, § 4 (1926). In 1930, the language “whether or not inimical to public welfare” was removed. Miss. Code Ch. 68 § 3440 (1930). The relevant language and penalty have remained unchanged since ' 1926. - Miss.Code Ann. §' 75-21-9 (Rev.2009) (“Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it '• and in addition a penalty of- five hundred dollars ($500.00)[.]”).
¶ 61. Thus, the major alteration in this statute was changing that a person may recover “all actual damages” to that a person may recover “all damages of every kind sustained by him.” In both versions of the statute; the person may also recover a penalty ,of $500. The change from “all actual damages” to “all damages of every kind sustained” appears to be more of a substantive, change than a structural one. Removing the specific type of damages (actual) and changing it to “all damages” ■broadens the types of damages that an injured party may recover. This is especially true when the statute is properly liberally construed to the end of suppressing trusts. See Miss.Code Ann. § 75-21-39 (Rev.2009). If the Legislature had meant to keep the damages recoverable the same, i.e., limited to actual damages, it had already specifically and clearly done so, and no plausible explanation exists for the Legislature to change, the language so drastically to language that less clearly limits the damages to actual damages. Furthermore, the injured party arguably did “sustain” punitive damages to some extent. Punitive damages are for the purpose of punishing the wrongdoer and deterring future similar conduct by others, thereby protecting the public.[25] Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239, 247 (Miss.1977) (quoting Snowden v. Osborne, 269 So.2d 858 (Miss.1972), overruled on other grounds by C & C Trucking Co. v. Smith, 612 So.2d 1092 (Miss.1992)). The injured party is ostensibly á member of the public, and thus sustained damages by the wrongdoer’s actions. Additionally, punitive damages, in part, “constitute[ ] compensation for the plaintiff for his or her ‘public service’ in bringing the action.” Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172, 1190 (Miss.1990); see also United American Ins. Co. v. Merrill, 978 So.2d 613, 636 (Miss.2007) (unanimously reaffirming Williams, 566 So.2d 1172).
¶ 62. Moreover, Section 75-21-39 also contains a savings clause, mandating that “[n]o right, liability, pain, penalty, forfeiture, prosecution or suit under laws existing prior to the adoption of this chapter shall be in any wise affected thereby[.]” *133 Miss.Code Ann. § 75-21-39 (Rev.20Q9). Punitive damages existed in Mississippi common law in the 1800s. See Bell v. Morrison, 27 Miss. 68 (1854). .Thus, the antitrust laws did not affect the liability for punitive damages, nor eliminate them as a penalty or as the subject of a suit.
¶ 63. It can hardly be -said in this case that the slightly more than $11,000 in actual damages and a $500 penalty would be anything more than a very light slap on the wrist to a corporation as large as GP. These amounts' can hardly be argued to do anything toward suppressing trusts and combines and encouraging competition.[26] Thus, when we liberally construe the statutes “to the end that trusts and combines may be suppressed, and the benefits ¿rising from competition in business preserved to thé people of this state[,]” we must conclude' that the Legislature meant to expand the damages allowable when it changed the language of the statute from “actual damages” to more expansive phrasing, and we must conclude that nothing in the antitrust statutes affects the right to pursue, or the liability for, punitive damages. Such damages provide a deterrent to trusts and combines and encourage competition in business for the benefit of the public, promoting the Legislature’s stated purpose of the antitrust statutes.
¶ 64. Because I conclude that punitive damages are allowed under the antitrust statutes, I will conduct a brief analysis of the other issues regarding punitive damages that GP raises on appeal.
.¶ 65. GP argues that no reasonable juror could have concluded that punitive damages were warranted under .Mississippi Code Section 11-1-65, and it had consequently moved for a directed verdict .on this issue at trial. The standard of review for a denial of a motion for directed verdict, considering the evidence in the light most favorable to the appellee and giving the appellee the benefit - of all- favorable inferences that may reasonably be drawn from that evidence, is whether “the facts are so overwhelmingly in favor of the appellant that reasonable jurors could not have arrived -at a contrary, verdict.” Mississippi Power & Light Co. v. Cook, 832 So.2d 474, 478 (Miss.2002). Conversely, if substantial evidence, or “evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions,” in support of the verdict exists, this Court- must affirm. Id.
' ¶ 66. Punitive damages may be awarded if the claimant proves by clear and convincing evidence that, the defendant “acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for1 the1 safety of others, or committed actual fraud.” Miss.Code Ann. § 11-1-65 (Rev.2014). The most relevant portion of the statute to this case is whether GP acted with “actual malice.”1 The section of this opinion regarding sufficiency of the evidence details many of the emails ’and' pricing - schemes of GP. This evidence is 'clearly of such quality and weight that reasonable and fair minded jurors in the exercise of‘ impartial judgment might have reached different conclusions as to whether actual malice existed. Thus, the'trial court did not err by denying GP’s motion for directed verdict as to punitive damages^ ‘'
¶ 67. GP also , argues in the alternative that if this Court does not reverse the punitive damages award, it should remit it. In reviewing the denial of a motion for a remittitur or a motion for a new trial on *134 the issue of punitive damages, this Court will only reverse where the trial court committed an abuse of discretion. Bankers Life and Cas. Co. v. Crenshaw, 483 So.2d 254, 279 (Miss.1985).
¶ 68. GP asserts that the punitive damages award should be remitted under Mississippi law. Mississippi Code Section 11-1-65 requires the trial court to take the following factors into consideration in determining whether a punitive damages award is excessive:
1. Whether there is a reasonable relationship between the punitive damage award and the harm- likely to result from the defendant’s conduct as well as the harm that actually occurred;
2.. The degree of reprehensibility of the defendant’s conduct, the duration of that conduct, the defendant’s awareness, any concealment, and the existence and frequency of similar past conduct;
3. The financial condition and net worth of the defendant; and
4. In mitigation, the imposition of criminal sanctions on the defendant for its conduct and the existence of other civil awards against the defendant for the same conduct.
Miss.Code Ann. § 11 — 1—65(1)(f)(ii) (Rev. 2014). The statute also notes that “the primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others[.]” Miss.Code Ann. § 11-1-65(l)(e) (Rev.2014); see also Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172 (Miss.1990) (punitive damages are for the purposes of punishment and deterrence). Punitive damages should be in an amount reasonably necessary to punish the wrongdoer, taking into consideration the harmful effect on the individual litigant and the public. See Employers Mut. Cas. Co. v. Tompkins, 490 So.2d 897 (Miss.1986). In determining the amount of punitive damages, four factors are considered: whether the amount punishes and deters the wrongdoer, whether the amount deters others, whether the amount accounts for the defendant’s financial worth, and whether the amount compensates the plaintiff for the public service in holding the defendant accountable.[27] Merrill, 978 So.2d at 636. GP opines that only the first and second statutory factors are relevant, because neither CTC nor GP offered any evidence as to the third and fourth factors. However, some financial information about GP was in the record. Moreover, in the heaxdng on the remittitur, the trial court noted that “to somebody like IBM or Georgia Pacific, $2.5 million based on their net worth is nothing. I mean, Mr. Cook was paid somewhere around 2.5 million over four years for the wood he sold.” The trial court also noted that the jury considered emails emanating from GP headquarters that could come across as “just being plain mean.”
¶ 69. GP’s argument in this regard primarily concentrates on the ratio of actual to punitive damages. It first notes that there is no reasonable relationship between the punitive damages award and the harm suffered, because the harm suffered was quantified as $11,089.47. It notes that the ratio between punitive and actual damages is large, more than 225:1. However, what GP fails to acknowledge is that the harm suffered in an antitrust case is largely harm to the public and to competition, not solely harm that resulted to the single plaintiff in this case. Moreover, the first statutory factor also considers the harm “likely to result” from GP’s behavior, *135 which the plaintiff showed was suppression of competition in the marketplace. This Court has approved punitive damages awards in ratios greater than the one in this case. See, e.g., Tompkins, 490 So.2d 897 (approving punitive damages in an amount 800 times greater than actual damages); Independent Life & Accident Ins. Co. v. Peavy, 528 So.2d 1112 (Miss.1988); State Farm Mut. Auto. Ins. Co. v. Grimes, 722 So.2d 637 (Miss.1998) (approving a punitive damages award with a ratio of punitive to compensatory damages of 658 to 1); see also TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (affirming punitive damages in an amount 526 times greater than compensatory damages).
¶ 70. The second factor looks at the reprehensibility of GP’s conduct, as well as the duration, GP’s awareness, any concealment, and the existence of similar past conduct. GP argues that its conduct was not reprehensible. Yet, as the trial court noted, some GP emails regarding the pricing schemes were “just being plain mean.”[28] Moreover, GP’s pricing schemes lasted for several years, thus the duration of the conduct was certainly significant. GP was also clearly aware of its pricing schemes, and the trial court noted that it at times invoked a “mean” spirit in applying them.
¶ 71. As relates to both of these factors, as well as the third factor, the record contains certain financial information regarding the schemes. For example, an email out of GP headquarters in Atlanta stated that “For every 1% that you can reduce overall wood cost, you will add $25 million to our operating profit. Thus, if we hit our goal of a 10% reduction across all products in the 3rd quarter, we will add $250 million to the bottom line.” A 1999 note from GP stated that “We finished the first half of 1999 with a great performance record for Wood and Fiber Procurement .... We have worked safely while lowering wood costs $120 million below last year at this time[.]” In another 1999 note from GP, industry news was quoted stating that GP’s “net income increased 114 percent to $311 million versus net income of $33 million in 1998.” A 2001 memo from GP stated that ‘Wood cost came down 7% on the average which translates into a savings to G-P of approximately $45 million over a quarter or $175 million on an annualized basis.” Yet another email noted that ‘You should all be proud of the accomplishments you have acheived [sic] thus far. Millions of dollars have been placed back in G-P’s pockets,’ instead of outsiders.” A November 1999 email noted that GP had “saved $142 million in wood cost Vs 1998. We will give up some of this in the fourth quarter but will still be above $130 million in savings. This will be approximately 10% of G-Ps profits for the year!” The record also contains other financial information about GP, as well as other information relating to the profits and savings from the schemes at issue.
¶ 72. Certainly, the information about the profits earned from the schemes relates to the relationship between the punitive damages award and the harm done or likely to occur, as well as the reprehensibility of the conduct. It further touches on the financial condition of GP; and is also important to determine the amount of punitive damages necessary to have a deterrent effect. The record makes clear that the profits from the schemes at issue were in the hundreds of millions of dollars over several years. It appears obvious that $2.5 million in punitive damages would be *136 a very small percentage of GP’s net worth. See Merrill, 978 So.2d at 636 (noting that the punitive damages award was acceptable, in part because it wa's less than one-half of one percent of the defendant’s net worth), Given all this information, the trial c.ourt clearly did not abuse its discretion by declining to remit the punitive damages award as determined by the jury.[29] It is difficult to imagine that a lesser award would “punish and deter” a corporation as large as GP.
¶ 73. Because I believe this Court should determine that Section 75-21-9 allows punitive damages in antitrust cases, I would affirm the trial court on this issue. I further believe that the punitive damages award at issue should be affirmed.
, RANDOLPH, P.J., AND KITCHENS, J., JOIN THIS OPINION.

. Cook Timber filed a motion for rehearing in this case. The Attorney General filed an amicus brief on behalf of the State of Mississippi because it was so concerned about the majority’s incorrect interpretation of the statute, which originally appeared to hold that no buying or purchasing behavior could come under the purview of the antitrust statutes. The attorney general argued that "the Court's description of [Section 75 — 21—3(c) ] could impair the State and private plaintiffs’ ability to halt all anticompetitive conduct which constitutes engrossing or forestalling a commodity. For instance, prohibited conduct includes preventing the normal course of trade by buying up vast amounts or otherwise diverting a commodity.” Georgia Pacific’s actions and attempted actions may be said to have been anticompetitive conduct which prevented the normal course of trade, particularly since the evidence indicates that Georgia Pacific was intentionally manipulating the normal course of trade,

. Punitive .damages also benefit the plaintiff in that, in the absence of statutory authority granting attorneys’ fees, attorneys’ fees are only proper when punitive damages are also proper. Mississippi Power & Light Co. v. Cook, 832 So.2d 474, 486 (Miss.2002). Thus, a punitive damages award essentially creates a right to recover attorneys' fees.

. Five hundred dollars in 1906, when considering the value of a dollar and the smaller nature of corporations, would have been a much better deterrent than five hundred dollars is in 2015. .

. As noted, punitive damages pave the way for a plaintiff to receive attorneys’ fees. Punitive damages are also meant to compensate the plaintiff for his public service in bringing the suit. Thus, attorneys’ fees may arguably be included in "all damages sustained” by the plaintiff under Section 75-21-9.

. For example, one email stated: "No one thinks it is your fault that the Indians have surrounded the wagon train, but don’t feel bad for killing'as many of them as you can before they kill us. Buy timber as cheap as you can.”

. GP also argues that the award violates due process under BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). That case states that the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility, Id. at 575, 116 S.Ct. 1589. It also requires a look at the ratio of punitive damages to the actual harm inflicted, as well as sanctions for comparable misconduct. Id. at 580-84, 116 S.Ct. 1589. Based on the same facts mentioned in the analysis under Mississippi law, I am of the opinion that the punitive damages award was constitutionally acceptable.